**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**ETS PAYPHONES INC., and Charles E. Edwards, Defendant.**

**No. Civ.A.1:00–CV2532JTC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 20, 2000.

1350

Edward Gary Sullivan, William P. Hicks, Securities & Exchange Commission, Atlanta, GA, for plaintiff.

William Scott Sorrells, Powell, Goldstein, Frazer & Murphy, Atlanta, GA, for defendant ETS Payphones, Inc.

Michael K. Wolensky, Angela G. Miele, Ethan H. Cohen, Kutak Rock LLP, Atlanta, GA, for defendant Charles E. Edwards.

## ORDER

CAMP, District Judge.

This case is before the Court on Plaintiff Securities and Exchange Commission's Motion for Preliminary Injunction [# 3–1].

## I. PROCEDURAL BACKGROUND

The Security and Exchange Commission ("Commission") brings this suit against ETS Payphones, Inc. and Charles E. Edwards for fraudulent and unregistered offering of securities in violation of the registration and anti-fraud provisions of the federal securities laws and seeks injunctive and other relief. Defendant ETS, who has filed for bankruptcy protection, consented to the injunction without admitting Plaintiff's allegations. Defendant Edwards, however, contends that (1) the sale/leaseback of pay telephones does not constitute a security; (2) the Commission is not entitled to an injunction because Defendant Edwards is not likely to continue selling these securities; and (3) the asset freeze sought by the Commission upon Defendant Edwards is unwarranted.

The Court finds that the Commission has produced sufficient evidence to support an injunction and makes the following findings of fact and conclusions of law:

## II. FINDINGS OF FACT

ETS Payphones, Inc. ("ETS") is a Georgia Corporation founded by Charles E. Edwards ("Edwards") in October 1994. For the past five years, ETS has offered and sold coin-operated telephones in units including a telephone, site lease, lease/back agreement, and buy/back agreement. An investor will pay $6,750.00 to ETS for a pay telephone, and ETS leases the telephone back from the investor for a fixed fee. The investor can, at his option, require ETS to repurchase the equipment at the end of the lease period or upon 180 days notice. Under the lease agreement, investors retain little, if any, control. Instead, Defendant manages, maintains, and operates the pay phones.

ETS offered and sold these investments to the general public through distributors and sales forces made up largely of licensed insurance agents. In their marketing efforts, ETS and its distributors used the mail and means such as internet websites to market the investments. However, ETS has not registered the sales as securities pursuant to the Securities Acts.

ETS advertised in sales literature that portrayed the company and its officials as experienced and successful in the telephone industry. Marketing brochures dis-

cussed the "profitability" of payphones and encouraged investors to "watch the profits add up." (Pl.'s Ex. 17). ETS websites noted the "profitable" opportunities for investors, and distributors offered individuals a fixed annual return of 14.1% on investments. (Pl.'s Ex. 22, 24).

Unfortunately for investors, these brochures, advertisements and websites failed to disclose the financial condition of the company. In reality, ETS always lost money on its payphone operations. In the first six months of this year, ETS lost more than $33 million. (Pl.'s Ex. 1). Similarly, from November 1998 to March 1999, ETS had an operating loss of $32 million. (Pl.'s Ex. 4). Because revenue from payphone operations never covered operating expenses, ETS had to attract an ever expanding number of investors to meet its obligations to existing investors. However, none of this information was disclosed. Instead, ETS continued to advertise the "profitability" of pay telephones, emphasizing the opportunities for investors to "watch the profits add up." (Pl.'s Ex. 17).

Despite these losses, Edwards continued to personally profit from the operation, receiving $2.24 million in compensation from ETS and Twinleaf, Inc. between 1998 and 2000. (October 12, 2000, Hearing Tr., pp. 68–69). He currently owns real estate worth more than $7 million. Similarly, a number of wholly owned subsidiaries also profited from ETS. From November 1998 to March 1999, ETS paid $3 million in management fees to an affiliated company owned by Edwards. (Pl.'s Ex. 4, Note H). Moreover, ETS financial statements indicate that the company transferred more than $11.6 million in interest free loans to companies controlled by Edwards. (Pl.'s Ex. 2, 4).

As owner/operator of ETS, Edwards directed company affairs, contracted with distributors to market telephone units, reviewed sales literature, and understood the true financial condition of the company. On September 11, 2000, ETS Payphones, Inc. filed for bankruptcy.

## III. CONCLUSIONS OF LAW

To obtain an injunction under Section 20(b) of the Securities Act of 1933 and Section 21(d) of the Securities and Exchange Act of 1934, the Commission must establish the following: (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *See SEC v. Unique Financial Concepts, Inc.,* 196 F.3d 1195, 1199 n. 2 (1999).

### A. Prima Facie Case

■ Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define a "security" to include an "investment contract." *See* 15 U.S.C. § 77b(a)(1) and 78c(a)(10) (1997). An investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The Eleventh Circuit has divided the *Howey* test into three elements: "(1) an investment of money; (2) a common enterprise; and (3) the expectation of profits to be derived solely from the efforts of others." *Villeneuve v. Advanced Business Concepts Corp.,* 698 F.2d 1121, 1124 (11th Cir.1983), *aff'd en banc,* 730 F.2d 1403 (11th Cir. 1984). For purposes of this case, only the second and third elements merit discussion.

### 1. Common Enterprise

■ In order to satisfy the second element of the *Howey* test, the Commission must establish that individuals invested money in a "common enterprise." A common enterprise exists where "the fortunes of the investor are interwoven with and dependant on the efforts and success of those seeking the investment or of third parties." *SEC v. Unique Financial Concepts, Inc.,* 196 F.3d 1195, 1199 (11th Cir. 1999) (quoting *Villeneuve,* 698 F.2d at 1124). The thrust of this test is that "in-

vestors have no desire to perform the chores necessary for a return." *Id.* at 1200 (quoting *Eberhardt v. Waters,* 901 F.2d 1578, 1580–81 (11th Cir.1990)). Instead, "the requisite commonality is evidenced by the fact that the fortunes of all investors are tied to the efficacy of the promoter." *Id.* (quoting *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 479 (5th Cir.1974)). Because emphasis is placed upon the relationship between the investors and the promoter, this concept is referred to as "vertical commonality."

Defendant argues that other courts have defined "common enterprise" as one which requires investors to share or pool funds in order to succeed in a venture. *See Revak v. SEC Realty Corp.,* 18 F.3d 81, 87–88 (2d Cir.1994); *Stenger v. R.H. Love Galleries, Inc.,* 741 F.2d 144 (7th Cir.1984); *Newmyer v. Philatelic Leasing, Ltd.,* 888 F.2d 385, 394 (6th Cir.1989). Under this definition, plaintiffs must demonstrate that the fortunes of individual investors are "inextricably intertwined by contractual and financial arrangements to that of any other investors." *Cooper v. King,* No. 95–00289, 1997 WL 243424 at *2 (6th Cir. May 9, 1997). This concept is referred to as "horizontal commonality." Defendant's scheme may amount to "horizontal commonality," but that is not the definition this court must apply.[1]

In this case, investors' fortunes are inextricably tied to Defendant Edwards and ETS. Investors purchase a pay phone for $6,750, lease it back to ETS, and receive a monthly payment as a return on their investment. They have no control over the pay phone and do not participate in its operation. Instead, Defendant manages and maintains the pay phone, offering to repurchase it upon termination of the lease. Recovery of this investment, however, depends upon the financial viability of the company and Defendant's ability to generate a profit. Therefore, the fortunes of investors are linked to the efficacy of the promoter. This program satisfies the common enterprise element of an investment contract.

## 2. Expectation of Profits

██ In order to satisfy this element of the *Howey* test, Plaintiff must establish that investors expect profits to be derived "solely from the efforts of the promoter or third party." *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103. If the investor controls the profitability of his investment, the agreement is not a security. Therefore, the "crucial inquiry is the amount of control that the investors retain under their written agreements." *Albanese v. Florida Nat'l Bank of Orlando,* 823 F.2d 408, 410 (11th Cir.1987). In *Albanese,* investors purchased an ice machine, leased it back to the company, and received a monthly return on investment. The company managed, maintained, serviced and operated the machines. Investors, however, were allowed to select the locations of the machines. *Id.* at 410.

The Eleventh Circuit concluded that this enterprise satisfied this element of the *Howey* test because investors expected profits to be derived solely from the efforts of others. While investors retained some control over their machines, this control was "insubstantial" and "illusory" because (1) the power to specify locations was limited to sites already procured by the corporation; (2) the corporation offered its expertise in finding locations, contracting with hotels, servicing the machines, and accounting for profits; and (3) the investors had no realistic alternative to allowing the corporation to manage their investments. *Id.* at 412; *see also, Unique Financial Concepts,* 196 F.3d 1195, 1201 (concluding that investors had no control

---

1. Unfortunately, neither definition of "common enterprise" adequately addresses the purpose of the federal securities laws—to protect potential and actual investors from fraud. A broader definition of commonality should protect individual investors who rely solely on the "efficacy" of the promoter, as well as multiple investors who "pool" their funds in order to share the risks and profits. *See* Marc G. Alcser, *The Howey Test: A Common Ground for the Common Enterprise Theory,* 29 U.C. Davis L.Rev. 1217 (1996).

over their investments and that profits were derived by defendant corporation under "any reasonable interpretation of 'solely' ").

In this case, Defendants monitored, managed, and maintained the pay telephones assigned to investors. After contributing money, Plaintiffs had little, if any, involvement in the enterprise. Any control that Plaintiffs may have retained was "illusory" or "insubstantial" because Defendants assumed all responsibility for the payphones. Investors never saw the telephones, never used the telephones, and often did not know where they were located. Because profits were derived "solely" from the efforts of the Defendant, the lease agreement satisfies the third element of an investment contract.

### 4. Violations

■ Since Defendant's payphone program is an investment contract, it is governed by the Securities and Exchange Acts. Section 5(c) of the Securities Act, 15 U.S.C. § 77e(a)(2), makes it unlawful to offer to sell a security for which a registration statement has not been filed. Similarly, Section 5(a) of the Securities Act, 15 U.S.C. § 77e(a)(3), makes it unlawful for persons to use any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security for which a registration statement is not in effect. Thus, Defendants have sold unregistered securities to thousands of people in thirty-eight states for the last five years. In order to make these transactions, Defendants used the mails and other forms of media, including internet websites. These activities constitute prima facie violations of Sections 5(a) and 5(c) of the Securities Act. *SEC v. Continental Tobacco Co.,* 463 F.2d 137, 155 (5th Cir.1972).

■ Furthermore, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act proscribe fraudulent conduct in connection with the offer, purchase and sale of securities. *See* 15 U.S.C. § 77q(a) and 15 U.S.C. § 78j(b). To establish a violation of these provisions, the Commission must show that Defendants (a) used jurisdictional means; (b) engaged in fraudulent schemes, practices or courses of business or made materially false or misleading statements; (c) in connection with the offer or sale of securities; and (d) for violations of Section 17(a)(1) and 10(b), acted with scienter. *Steadman v. SEC,* 603 F.2d 1126, 1131–33 (5th Cir.1979), *aff'd,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981).

Here, Defendant Edwards used the mails (to send promotional sales materials to distributors and investors) and instrumentalities of interstate commerce (e.g., an Internet web site to provide sales materials) in connection with the offer or sale of securities. Such activity satisfies the jurisdictional means requirement. *See Glick v. Campagna,* 613 F.2d 31, 35–36 (3d Cir. 1979).

Moreover, Defendant failed to adequately inform investors of the financial condition of the company. Investors were not told: (1) that ETS had failed to make a profit; (2) that ETS was losing money on its payphone program; and (3) that ETS depended on funds from new investors in order to sustain operations. Instead, investors were led to believe that both ETS and its payphone program generated a profit. These misrepresentations and omissions are material because they go to the essence of the investment decisions made by individual investors. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (determining that information is material and must be disclosed if there is a substantial likelihood that "the disclosure of the omitted facts would have been viewed by the reasonable investors as having significantly altered the 'total mix' of information made available.").

■ Finally, the Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). In the Elev-

enth Circuit, scienter may be shown by "severe recklessness," defined as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989).

The misrepresentations and omissions made by Defendant amount to severe recklessness. Defendant was aware of the financial condition of ETS and the fact that ETS relied solely on funds from new investors in order to sustain operations. Despite this knowledge, Defendant marketed the program as a profitable enterprise "ringing with opportunity."

## B. Reasonably Likely to Continue These Violations

In order to obtain a preliminary injunction, the Commission must also show that Defendant Edwards is reasonably likely to continue violating the securities laws. *See Unique Financial Concepts,* 196 F.3d at 1199 n. 2; *SEC v. Int'l Heritage, Inc.,* 4 F.Supp.2d 1368, 1372 (N.D.Ga. 1998) (Story, J) (concluding that an injunction is warranted if there is a "reasonable likelihood that Defendants are engaged or are about to engage in practices that violate federal securities law").

Analysis of a number of factors determines the likelihood of future violations. Courts must consider "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Id.* Courts place special emphasis on "proof of past substantive violations that indicate a reasonable likelihood of future substantive violations." *Id.*

The evidence in this case supports Plaintiff's request for a preliminary injunction. First, Defendant's actions were egregious in operating an investment scheme at a significant loss while only he profited. While the company lost millions, Defendant sponsored a NASCAR racing team, purchased a home on Sea Island, and received $700,000 in "consultant" fees from another payphone enterprise.

Second, Defendant's occupation presents opportunities for future violations. Defendant operates a number of wholly owned subsidiaries created to support, supplement, and develop the ETS pay phone enterprise. Because these companies may contain funds (in the form of loans) which are rightfully owned by ETS investors, a preliminary injunction is necessary to prohibit Defendant from using these subsidiaries to market similar investment programs.

Finally, Defendant acted with scienter because he knew that his conduct might violate securities laws. Over the past eighteen months Defendant received cease and desist order from courts in North Carolina, Kansas, and Rhode Island. Despite these warnings, Defendant continued to operate this enterprise. Because Defendant's conduct was egregious, systematic, and continuous for a number of years, a preliminary injunction is warranted.

## C. Asset Freeze

The purpose of an asset freeze is to insure that any funds which may become due can be collected. *SEC v. Unifund SAL,* 910 F.2d 1028, 1041 (2d Cir.1990). In order to obtain an asset freeze, the Commission must show that it is likely to succeed on the merits of its claim. *SEC v. Cavanagh,* 155 F.3d 129, 132 (2d Cir.1998). As stated in Part II of this Order, that standard has been met.

ETS, under Edward's control, engaged in the unregistered sale of securities in violation of federal law. Edwards profited from this enterprise, receiving approximately $15 million in the form of interest

**1356**

free loans and fees to companies that he owns. Edwards also received $2.24 million in compensation from Twinleaf and ETS, and currently owns real estate valued at $7 million. In order to preserve secure assets for disgorgement if it becomes appropriate, an asset freeze of Defendant Edwards' assets is necessary.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction and Asset Freeze [# 3–1] is **GRANTED.**