[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 5, 2005
THOMAS K. KAHN
CLERK

Nos. 01-10107 & 02-11393

_____

D. C. Docket No. 00-02532-CV-JTC-1

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

ETS PAYPHONES, INC.,

Defendant,

CHARLES E. EDWARDS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 5, 2005)

ON REMAND FROM THE SUPREME COURT
OF THE UNITED STATES

Before EDMONDSON, Chief Judge, HILL and LAY*, Circuit Judges.

_____
* Honorable Donald P. Lay, United States Circuit Judge for the Eigth Circuit, sitting by
designation.

PER CURIAM:

In 2002, we decided Charles E. Edwards's (Edwards) appeal from the district court's grant of the Securities and Exchange Commission's (SEC) motion for preliminary injunction and asset freeze against Edwards. The asset freeze included the assets of Edwards's wholly-owned corporation, Twinleaf, Inc. (Twinleaf). We determined that the district court lacked subject matter jurisdiction because the investments offered by Edwards were not "securities" under federal securities laws. SEC v. ETS Payphones, Inc., 300 F.3d 1281, 1285 (11th Cir. 2002). On review, the Supreme Court clarified that investments with a fixed rate of return could constitute an "investment contract" under the Securities Acts of 1933 and 1934. SEC v. Edwards, 124 S.Ct. 892, 898-99 (2004).

Edwards's original appeal, by remand from the Supreme Court, is before us again. In the interim, Edwards moved the district court for a modification of the asset freeze to permit Twinleaf to pay its attorneys fees. The district court denied Edwards's motion, and he appealed.

We now consider both appeals. We must decide, specifically, whether (1) the transactions offered by Edwards were securities under the Securities Acts of 1933 and 1934; (2) the district court clearly erred when it found Edwards was likely to violate securities laws in the future; (3) Edwards can be personally liable

2

for violations of federal securities acts; and (4) the district court erred by denying Twinleaf, Inc., use of its funds to pay attorneys fees for this action.

## FACTS

We adopt the statement of facts from our earlier opinion reported in 300 F.3d 1281.

## STANDARD OF REVIEW

We review a trial court's decision to grant injunction under the abuse of discretion standard. Klay v. United Healthcare Group, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004). Determinations of law are reviewed *de novo*, while the findings of fact that support an injunction are reviewed for clear error. SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1198 (11th Cir. 1999). To reverse the injunction on a question of jurisdiction, the plaintiff (here, the SEC) must "only establish a 'reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.'" Id. (citations and quotation omitted). We review an asset freeze for an abuse of discretion, though we do not defer to the district

3

court's legal analysis. Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 986-87 (11th Cir. 1995).

## JURISDICTION

The Securities Acts of 1933 and 1934 define a "security" as including "investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). The Supreme Court has set out the test for determining whether a transaction qualifies as an "investment contract" in SEC v. W.J. Howey Co., 66 S.Ct. 1100 (1946). Under Howey, a security must include four components: (1) an investment of money, (2) a common enterprise, (3) the expectation of profits, and (4) the expectation of profits to be derived solely from the efforts of others. Unique Fin. Concepts, 196 F.3d at 1198.[1]

Our prior decision in this case concluded that the transactions involved an investment of money. 300 F.3d at 1283. The Supreme Court said the fixed rate of return offered by Edwards could constitute an "expectation of profits." Edwards,

---

[1] In Unique Fin. Concepts, this Court derived a three-element test from Howey. 196 F.3d at 1198 ((1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others). For the purposes of this appeal, we examine separately the two aspects of the third element: the expectation of profits *and* whether those profits are derived solely from Edwards's efforts.

124 S. Ct. at 898-99. We now examine whether the SEC sufficiently demonstrated the second and fourth elements of the Howey test.

In our earlier ruling, we reaffirmed this Circuit's adherence to the "broad vertical commonality" test for determining whether investors operated under a common enterprise. ETS Payphones, Inc., 300 F.3d at 1284. That test requires the movant to "show that the investors are dependent upon the expertise or efforts of the investment promoter for their returns." Id. at 1284.

The district court found that "ETS had to attract an ever expanding number of investors to meet its obligation to existing investors." ETS Payphones, Inc., 123 F. Supp.2d 1349, 1352 (N.D. Ga. 2000). Investors were dependent upon Edwards's ability to attract new business to realize profits. Ninety-nine percent of investors leased back the phones they bought from one of Edwards's companies to another company of his. Thus, investors evidently had no desire "to perform the chores necessary for a return" on their investment. Eberhardt v. Waters, 901 F.2d 1578, 1580-81 (11th Cir. 1990) (defining the "thrust of the common enterprise test"). Given the factual findings of the district court and our review of the record, we conclude the SEC made, at this preliminary stage, a sufficient showing on the second element: a common enterprise.

The fourth element of the Howey test asks the "amount of control that the investors retain[ed] under their written agreements." Albanese v. Fla. Nat'l Bank of Orlando, 823 F.2d 408, 410 (11th Cir. 1987). The more control investors retain, the less likely it becomes that the contract qualifies as a security. ETS investors retained minimal control over the telephones. Once an investor leased the phone back to ETS (which ninety-nine percent did), that investor relied on ETS (and Edwards) for profits. See Eberhardt, 901 F.2d at 1581 (considering that the average investor relied on defendants for success). In addition, through his companies, Edwards provided the "essential managerial efforts" of phone placement, collection and maintenance. SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 483 (5th Cir. 1974).[2] And, this fact is important: these managerial efforts included the sole discretion over where to place telephones. See SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1201 (11th Cir. 1999) (considering defendant's sole discretion over investment funds).[3] We see no abuse of discretion in the district court's conclusion that the SEC met its burden of showing a reasonable probability of success on the jurisdictional question.

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), this Court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

[3] In making this determination, we often look to the actual relationship between the parties. See Albanese, 823 F.2d at 412 (reasoning that any control retained by investors was "illusory" despite contractual terms).

## REASONABLE LIKELIHOOD OF CONTINUING VIOLATIONS

To grant a preliminary injunction in a securities case, a plaintiff must provide, among other elements, "positive proof" that the defendant will likely violate securities laws in the future. SEC v. Caterinicchia, 613 F.2d 102, 105 (5th Cir. 1980) (citing SEC v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978)).

The district court concluded that the SEC met this burden. ETS Payphones, Inc., 123 F. Supp.2d at 1355. We review that determination for an abuse of discretion. Unique Fin. Concepts, Inc., 196 F.3d at 1198. That Edwards has complied with the SEC since the inception of the SEC suit is undisputed. Yet, we must weigh this compliance against the magnitude of the alleged fraud and examples of potential malfeasance, including a finding of scienter, and allegations of state law violations by ETS committed before the SEC's involvement. SEC v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982) (considering "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations").

7

When weighing these issues, we must also recognize "that for the matter in question there is a range of choice for the district court and so long as its decision does not amount to a clear error of judgment we will not reverse even if we would have gone the other way had the choice been ours to make." McMahan v. Toto, 256 F.3d 1120, 1128 (11th Cir. 2001). As such, we see no abuse of discretion in the district court's decision to grant the preliminary injunction.

INDIVIDUAL LIABILITY

Edwards argues that, if the investments were securities, they were issued by ETS, not by him. This argument is without merit. United States v. Rachal, 473 F.2d 1338, 1341-42 (5th Cir. 1973) (exempting individuals from the reach of the Securities Act would "eviscerate" it).

Edwards also challenges the court's finding of scienter, a necessary element of fraud under the securities laws. The district court found that ETS "always lost money on its payphone operations." SEC v. ETS Payphones, Inc., 123 F. Supp. 2nd 1349, 1352 (N.D. Ga. 2000). The district court also specifically found that Edwards was aware of ETS's financial condition. Id. at 1355. Edwards contends

8

that because ETS used non-standard accounting methods, he lacked an intent to defraud investors.[4]

We review findings of scienter for clear error. Lucas v. Fla. Power & Light Co., 765 F.2d 1039, 1040 (11th Cir. 1985). The SEC provided evidence that neither ETS nor its representatives, including Edwards, disclosed to investors that ETS would be unable to buy back phones if a substantial number of investors so requested. Edwards admits that ETS relied on new investors to sustain operations. This reliance was also not conveyed to investors. Instead, Edwards sent a letter to "leaseholders" on 1 June 2000 stating that ETS remained profitable, even though ETS declared bankruptcy on 11 September 2000. Given the other facts, we see no clear error in the district court's additional finding of scienter. Accordingly, we see no error in the district court's decision to grant the preliminary injunction against Edwards personally.

## EDWARDS'S ASSET FREEZE

---

[4]Edwards admittedly did not employ the Generally Accepted Accounting Principles (GAAP). The SEC demonstrated that when GAAP methods are employed, ETS's financial losses are undeniable. The Government expert conceded, however, that under the methods used by ETS, no loss was apparent. The trial court considered this testimony when ruling and rejected Edwards's purported reliance on the non-standard methods.

The district court ordered that Edwards's assets be frozen to preserve sufficient funds for potential disgorgment. ETS Payphones Inc., 123 F. Supp.2d at 1356. On the initial appeal, Edwards challenged this freeze, arguing it was facially invalid and that it failed to show assets were acquired by fraud.[5] We conclude that the district court did not abuse its discretion when ordering a freeze of Edwards's assets.

We reject Edwards's facial challenges. Edwards argues that the Supreme Court decision of Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 119 S. Ct. 1961 (1999) ("Grupo Mexicano") prevents a pre-judgment freeze of his assets. Grupo Mexicano addressed the issue of whether "in an action for *money damages*, a United States District Court has the power to issue a preliminary injunction" amounting to a freeze of assets. 119 S. Ct. at 1964 (emphasis added). The Court answered the question "no," but it distinguished those cases where the ultimate relief sought is equitable. Id. at 1971 (discussing Deckert v. Independence Shares Corp., 61 S. Ct. 229 (1940) and United States v. First Nat. City Bank, 85 S. Ct. 528 (1965)).

---

[5]The SEC argues that Edwards did not preserve his appeal on the scope of the asset freeze. See Federal Trade Comm'n v. Alantex Assoc's, 872 F.2d 966, 970 (11th Cir. 1989) (concluding appellant waived right to challenge asset freeze because it did not request the release of funds for specific purpose). We disagree. Edwards challenged the reach of the asset freeze, including the affect on Twinleaf.

The Fourth Circuit recently addressed this issue and said that in cases involving equitable relief, even where money damages are also claimed, Deckert controls. United States v. Oncology Assoc's, P.C., 198 F.3d 489, 498 (4th Cir. 1999). Under Deckert, equitable remedies employed to "preserve the status quo" are proper in actions arising under the Securities Act. 61 S. Ct. at 234. We accept the reasoning of the Fourth Circuit and conclude that Grupo Mexicano does not control the outcome of this case, because the SEC seeks equitable relief (disgorgment), not just money damages.[6]

We acknowledge that the SEC also seeks the legal remedy of civil damages. But, the asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgment. We do not believe that the inclusion of a claim for civil penalty damages makes the remedies sought wholly legal and not equitable.

Edwards's second facial challenge is based on the SEC's decision not to follow the procedures set forth in the Federal Debt Collection Act ("FDCA"). 28 U.S.C. § 3001 et. seq. The FDCA applies to situations where the government

---

[6]Contrary to Edwards's assertions, disgorgment is an equitable remedy. See, e.g., SEC v. Yun, 327 F.3d 1263, 1268 n.10 (11th Cir. 2003) (distinguishing between legal damages and equitable disgorgement); SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978). See also Tull v. United States, 107 S. Ct. 1831, 1839 (1987).

11

seeks "to recover a judgment on a debt; or to obtain, before judgment on a claim for a debt, a remedy in connection with such claim." 28 U.S.C. § 3001(a).

The FDCA is inapplicable to this case for two reasons. First, the SEC is not now seeking to recover for a judgment or "obtain" any assets. At this point, the SEC is attempting to freeze assets to prevent their disbursement; no money is being transferred to the federal treasury or registry of the court. Second, the statutory definition of "prejudgment remedy" does not include disgorgement. 28 U.S.C. § 3002(11). Accordingly, even if we assume, without deciding, that a claim for disgorgement seeks collection of a "debt" as defined by the FDCA, the means the SEC employed to secure that debt in this case (disgorgement) is not one of the prejudgment remedies covered by the FDCA.[7] The asset freeze, as it applies to funds potentially subject to disgorgement, is facially sound. We reserve judgment on the applicability of the FDCA to the SEC's claim for civil penalties.

Edwards also challenges the scope of the asset freeze. The SEC's burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: "a reasonable approximation of a defendant's ill-gotten gains

---

[7]Edwards also argues that Rule 64 of the Federal Rules of Civil Procedure should have controlled the lower court's disposition of his assets. We disagree. Rule 64 applies in cases of "arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies." Fed. R. Civ. P. 64. Disgorgement is unlike these remedies. See generally, Blatt, 583 F.2d at 1335.

12

[is required] . . . Exactitude is not a requirement." SEC v. Calvo, 378 F.3d 1211, 1217 (11th Cir. 2004). But, the "power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978).

Given our other conclusions, we can presume gains from ETS were acquired through fraud. Accordingly, any money distributed from ETS to Twinleaf or Edwards would be subject to a disgorgement order. "The purpose of disgorgement is . . . to deprive the wrongdoer of his ill-gotten gain." Blatt, 583 F.2d at 1335.

The SEC continually cites $300 million as the total amount of ill-gotten gains by ETS, but neither the record before us nor a finding of the district court sufficiently establishes that amount. The record is consistent with the SEC's appellate brief: the SEC suggests, without a specific rebuttal from Edwards, that from 1996 through 2000, Edwards personally received at least $3.04 million in compensation from ETS and Twinleaf.[8] Twinleaf obtained at least $18.4 million in payments and interest free loans from ETS. Accordingly, approximately $21 million should be subject to disgorgement.

---

[8]The SEC stresses that Edwards's own testimony at the preliminary hearing revealed the $2.24 million figure. Edwards's accounting, however, shows him receiving over $2.7 million in compensation from ETS and Twinleaf for the same period.

Against this potential equitable liability of $21 million, the district court found that Edwards possesses $7 million in personal real estate assets. 123 F. Supp.2d at 1356. In 2000, Edwards estimated in his deposition that Twinleaf's actual value at $13 to $15 million. In 2001, he revised that number to $2.09 million in cash. But, we use the 2000 calculation to examine whether, at the time the district court made the decision to freeze all assets, the court abused its discretion. Cf. Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184, 1887 (5th Cir. 1979) (acknowledging that appellate review may consider the "posture of the proceedings at the time of entry").

When totaling Twinleaf's value with Edwards's personal assets, it appears that the most Edwards possessed in 2000 was $22 million; the least he controlled was $20 million. Accordingly, Edwards failed to meet his burden of showing the SEC's fallback number of $19 million for potential liability is an unreasonable approximation. SEC v. Calvo, 378 F.3d 1211, 1217 (11th Cir. 2004).[9] Edwards's arguments about the asset freeze are not based on Twinleaf's actual value in 2000. Thus, if Twinleaf's value in 2000 was as low as the $13 million estimated by Edwards, a full asset freeze would be necessary to preserve such funds for

[9]This number, cited by the SEC in its brief, is exclusive of prejudgment interest.

potential disgorgment. Given these facts, the district court did not abuse its discretion when it froze all of Edwards's assets.

## MODIFICATION OF ASSET FREEZE FOR ATTORNEYS FEES

Edwards also appeals the district court's denial of his request to permit Twinleaf to use its assets to pay its attorneys fees. These fees accrued during attempted settlement negotiations with the SEC and as a result of submitting accountings and weekly financial reports.

In addition to the challenges discussed above, Edwards argues that the asset freeze violates Twinleaf's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution. Edwards also argues that, under Georgia law of corporations, he cannot be responsible for Twinleaf's legal fees.

The standing and mootness doctrines bar us from deciding whether Twinleaf should be permitted to pay its own legal expenses. Edwards concedes that Twinleaf is a nonparty to this litigation. Therefore, to achieve standing, Edwards must show that he and Twinleaf have a close relationship, and that "some obstacle" prevents Twinleaf from asserting its rights. See Planned Parenthood Ass'n of Atlanta Area, Inc. v. Miller, 934 F.2d 1462, 1465 n.2 (11th Cir. 1991).

15

Edwards made no such showing.  In addition, the argument is moot.  Edwards acknowledges that Twinleaf is no longer subject to an asset freeze, but he fears it may be subject to one later.  Edwards has not convincingly demonstrated why his fear is likely to be realized.

We also reject Edwards's argument that Twinleaf should pay for the weekly reports of revenues earned by it.  Edwards *personally* agreed, by consent order, to provide such reports.  The consent order is interpreted as a contract, and he is bound by it.  See Robinson v. Collert, 602 F.2d 87, 92 (5th Cir. 1979).[10]

Thus, in all matters, the district court's orders are affirmed.

AFFIRMED.

---

[10]Edwards also argues that the district court erroneously relied on two cases from the Seventh Circuit.  SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993); SEC v. Cherif, 933 F.2d 403 (7th Cir. 1991). We review district court judgments; we do not grade the opinions.  We agree with Edwards that the decisions are not on point.  Quinn involved the asset freeze of one person, and that person violated the preliminary injunction.  997 F.2d at 289.  Cherif involved persons who did not submit to an accounting.  933 F.2d at 403.  Edwards has been far more cooperative than the defendants in those cases. Still, we may affirm the district court's judgment, even if we do not agree its reasoning.  See Rosen v. Cascade Int'l, Inc., 21 F.3d 1520, 1527 n.13 (11th Cir. 1994).