**SECURITIES AND EXCHANGE COMMISSION Plaintiff**

v.

**Michael LAUER, Lancer Management Group, LLC, and Lancer Management Group II, LLC, Defendants**

and

**Lancer Offshore, Inc., Lancer Partners, LP, Omnifund, Ltd., LSPV, Inc., and LSPV, LLC, Relief Defendants.**

No. 03–80612–CIV.

United States District Court, S.D. Florida.

Aug. 18, 2006.

---

Christopher E. Martin, Senior Trial Counsel, U.S. Securities and Exchange Commission, Miami, FL, for Plaintiff.

## ORDER

MARRA, District Judge.

THIS CAUSE is before the Court upon Defendant Michael Lauer's Motion to Modify Preliminary Injunction Order to Permit Access to His Frozen Funds For Legal Defense Costs [DE 1306]. The Court has carefully considered the motion, response, the Receiver's joinder with the SEC's response, Lauer's reply, the SEC's sur-reply, Lauer's sur-reply and the SEC's additional exhibits in support of its response. In his motion, Lauer requests that $777,758.54, the proceeds being held by the Receiver from the sale of Lauer's New York condominium,[1] be released from the asset freeze. Lauer seeks these funds "to mount a meaningful legal defense in this litigation" pursuant to the Preliminary Injunction Order which provides that Lauer may apply to the Court for a modification to unfreeze funds to pay for legal expenses. *See* DE 22 at 7–8. Lauer has made prior applications to modify the asset freeze order, but asserts that the due process ramifications of the asset freeze, in the context of Lauer's meaningful opportunity to be heard at trial, have not been raised by him in the past.[2]

1. *See* Seventh Report of Receiver at 15 [DE 1131].

2. Lauer has made sixteen prior requests to modify the asset freeze. Carl Schoeppl, Lauer's counsel, submitted an affidavit that listed nine attempts. He did not mention seven other attempts by Lauer to modify the freeze: (1) Lauer's Memorandum of Opposition to Plaintiff's Motion to Strike and Reply to Plaintiff's Response to Respondent's Motion for Court to Compel the Plaintiff to State with Required Specificity the Amount of Possible Disgorgement of Alleged III–Gotten Gains as per Complaints' Requested Relief ("Motion to Compel Disgorgement Amount") [DE 874], which Magistrate Vitunac found to be "a thinly veiled effort to modify the Asset Freeze Order" [DE 929 at 3]; (2) Respondent's Motion for District Court to Reconsider Magistrate's Order Denying Respondent's Motion to Compel Plaintiff to State With Required Specificity Amount of Possible Disgorgement of Alleged III–Gotten Gains [DE 966]; (3) Lauer's Motion for Dismissal/Summary Judgment [DE 746], where Court found that "Lauer requests that the Court once

## Background

On July 10, 2003, after finding that the SEC had made a *prima facie* case, the Court entered an *ex parte* temporary restraining order against Lauer and granted other ancillary relief, including a temporary freeze of all of Lauer's assets for ten days in order to maintain the status quo [DE 19]. Within ten days thereafter, Lauer had the opportunity to contest the SEC's allegations and dispute the Court's findings at an evidentiary hearing. Instead, Lauer, while represented by counsel, consented to a Preliminary Injunction Order.[3] This Order continued the freeze on all of his assets to preserve sufficient funds for potential disgorgement pending resolution of the case on the merits, or further order of the Court [DE 22].

On August 19, 2003, Lauer filed a Motion to Modify the Preliminary Injunction to exempt from the asset freeze "prior acquired assets," including the New York condominium in question, in order to pay living expenses and litigation costs, including attorneys' fees [DE 31]. Lauer claimed a need for $93,000 per month. The motion was extensively briefed, Chief Judge William J. Zloch held an evidentiary hearing on the matter, and written closing arguments were submitted. The Court granted Lauer's request for a modification and ordered the Receiver to release $10,000 per month for his living expenses and attorneys' fees. The Court found that

the allegedly defrauded investors were best served by Lauer selling his house at 7 Dwight Lane, Greenwich, Connecticut, and the condominium at 160 West 66th Street, New York, New York. The proceeds of these sales were to be placed in an escrow account out of which the monthly stipend would be paid. [DE 108].

Lauer did not like the modification ordered. On February 2, 2004, he filed a Motion for Reconsideration of the Modified Injunction Order [DE 150]. Chief Judge Zloch granted a hearing on the matter and on March 10, 2004, Lauer represented to the Court that he preferred the terms of the original Injunction Order to those of the Modified Injunction Order [*see* DE 249 at 4–5]. Lauer also stated that he had been able to pay approximately $25,000 per month in expenses from funds gathered from sources other than those covered by the Injunction Order and Asset Freeze. *Id.* Thus, on April 2, 2004, at Lauer's request, the Court entered its Omnibus Order vacating the portion of the Modified Injunction Order which provided for the sale of certain assets and the monthly payment to Lauer by the Receiver. *Id.* at 7.

In the instant motion, the five main arguments made in support of Lauer's request that funds be unfrozen for his legal defense include: (1) the asset freeze is unfair; (2) the court does not have equita-

---

again revisit the entry of the asset freeze, preliminary injunction" [DE 1075 at 2]; (4) Lauer's Response in Opposition to Motion by U.S. to Modify Asset Freeze, where he asks the Court to modify the asset freeze Order [DE 1171 at 9–10]; (5) Lauer's Response in Opposition to Motion of Mizuho Corp. Bank For Leave to Intervene and For Relief From the Asset Freeze Order [DE 1301 at 9–10]; (6) Lauer's Emergency Motion to Grant Access to Personal Funds For Living Expenses and Legal Fees Due to New Developments and Circumstances [DE 468]; and (7) Lauer's Motion For Release of Funds to Finance Mother's

Medical Expenses [DE 447]. While Lauer fails to give any reason why he meets the standard for reconsideration pursuant to Fed. R.Civ.P. 59(e) or a motion for relief pursuant to Fed.R.Civ.P. 60(b), and he has at least five times sought to modify the freeze to allow him access to funds for experts or counsel [*see* DE # s 31, 150, 345, 352 & 468], the Court will nonetheless address Lauer's request one final time.

3. The consent order is interpreted as a contract, and he is bound by it. *See Robinson v. Vollert,* 602 F.2d 87, 92 (5th Cir.1979).

ble authority to freeze assets prior to entry of a final judgment for money damages; (3) freezing all of his assets for an indefinite period of time is improper; (4) he has a due process or constitutional right to counsel in this proceeding; and (5) the Court does not have the equitable power to freeze assets not traceable to the fraud.

The SEC responds to each of these arguments asserting that they are not applicable. In addition, the SEC urges the Court to reject Lauer's 17th attempt to modify the asset freeze because of his unclean hands in repeatedly violating the asset freeze order.

**Fairness** [4]

Lauer argues that fundamental fairness mandates that the Receiver turn over the $777,758.54 received from the sale of the condominium so that he can pay legal fees, expert witness fees, copying costs, travel and incidental expenses, deposition transcript expenses, and other costs incurred in connection with defending himself in this action (with leave to seek additional funds to pay further legal fees and costs if necessary).[5] Lauer argues that, in fairness to him, he must have access to experienced and knowledgeable counsel.[6] Lauer refers the Court to Chief Judge Zloch's

Order modifying the asset freeze (which terms Lauer rejected and successfully moved to be reconsidered). In that Order, Chief Judge Zloch recognized the benefit of a full and fair adjudication of the issues and that it would be beneficial for Lauer to be represented by experienced and knowledgeable counsel. Unfortunately, Lauer did not like the price at which the unfrozen funds came and requested that the terms of the original asset freeze remain in effect. This was the second time Lauer agreed to the blanket asset freeze within the Preliminary Injunction.

Lauer also cites a Western District of Virginia case which looked at both sides of this issue in a securities enforcement action and decided to allow the respective attorneys to file estimates of the fees necessary to take them through a hearing on a preliminary injunction. If the court found the estimates reasonable, the court agreed to approve them. The court noted:

The case law is anything but consistent on whether defendants in this type of civil enforcement action may be permitted to pay attorney's fees with a portion of their frozen assets. On one end of the spectrum is the Seventh Circuit

---

4. Lauer makes a number of frivolous arguments which will not be addressed, some of which include: (1) the asset freeze is responsible for his being found in contempt; (2) he is unfairly being forced to financially subsidize the SEC and DOJ investigations against himself (because he was the largest investor in the Lancer funds) while at the same time having no access to his own funds so that he can defend himself; and (3) the asset freeze is a litigation tactic to pressure him and deny him an adequate defense.

5. Schoeppl estimates that attorney's fees and litigation costs from this point through trial will exceed $1 million in total.

6. Lauer also complains of the delay in getting to trial, and the "burden" of the voluminous

court file on any new attorney. The Court notes, that in all fairness, Lauer is in large part responsible for the magnitude of the docket and if there is any prejudice due to delay, it was created by Lauer himself. Lauer has filed a large number of motions, many reraising issues on which he did not get a favorable ruling. All these motions have required responses from the SEC and the Receiver and forced them to expend extensive and often unnecessary time and effort. Additionally, Lauer's contempuous behavior has required the SEC and the Receiver to file and reply to multiple motions to compel, notices that Lauer has failed to comply with discovery, applications for an order to show cause why Lauer should not be held in contempt of court, and much more.

which has not minced words in expressing its opposition to such requests:

Just as a bank robber cannot use the loot to wage the best defense money can by [sic], (internal citations omitted), so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime. (internal citations omitted) *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993).

A similar philosophy was expressed in the *Coates* case in the Southern District of New York where the court found that "[a] defendant is not entitled to foot his legal bill with funds that are tainted by his fraud," *Securities and Exchange Commission v. Coates*, 1994 WL 455558 at *3 (S.D.N.Y. Aug. 23, 1994). The *Coates* Court ordered a hearing to determine whether any of the assets were not tainted by fraud. However, at least one court has found that such a showing by the defendant would be irrelevant where the potential disgorgement order would vastly exceed the assets that had been frozen. *See SEC v. Current Financial Services*, 62 F.Supp.2d 66, 68 (D.D.C.1999) (finding that the defendant's profit from fraud exceeded $156,000.00 and his frozen funds only amounted to $44,000.00 and denying a motion to unfreeze assets for attorney's fees).

In contrast, other courts have approved attorney's fees. Notably, the Seventh Circuit indicates, without comment, in *Quinn* that the district court had "indicated willingness to release small amounts so that [the defendant] could defend this suit, and on occasion the court did so." 997 F.2d at 289. Attorney's fees were also granted in *SEC v. Duclaud Gonzalez de Castilla*, 170 F.Supp.2d 427 (S.D.N.Y.2001) where the court explained that the defendants had presented a possible challenge to the SEC's evidence and that substantial le-

gal work had already been performed in arguing summary judgment motions. *See also SEC v. Int'l Loan Network, Inc.*, 770 F.Supp. 678, 680 (D.D.C.1991) (mentioning that it had granted a modification of the asset freeze to permit defendants to retain counsel on their behalf).

This court's central concern is the fairness of the proceedings. The court does not believe that it could achieve a fair result at the preliminary injunction hearing were it to deny defendants the ability to retain counsel. This is a complex legal matter, and lawyers are essential to the presentation of issues related to it.

*S.E.C. v. Dowdell*, 175 F.Supp.2d 850, 855–56 (W.D.Va.2001).

Lauer was given the chance to have counsel to represent him but he rejected the deal. Now he is in contempt of court and the Court has stricken his affirmative defenses and prohibited him from presenting any witness or evidence not already disclosed or produced by him in discovery [DE 1218]. Lauer "knowingly, wilfully, intentionally and repeatedly violated" multiple Court Orders [DE 1218 at 17]. He failed to disclose numerous assets and diverted assets from the freeze in violation of the very same order of which he now seeks an equitable modification for his own benefit.

██ A cardinal rule of equity is "he who comes into equity must come with clean hands [i]t is a self-imposed ordinance that closes the door . . . to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument v. Automotive Maintenance Machinery*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Under this cardinal rule of equity, Lauer's unclean hands have closed the door on any attempt by Lauer to seek relief from the

Court's equitable asset freeze order, an order to which he agreed.

### Equitable Authority to Order Freeze

■ Section 21(d)(1) of the Exchange Act allows courts to enter "a temporary restraining order or a permanent injunction" against "any person . . . engaged or . . . about to engage in acts or practices constituting a violation" of the securities laws. 15 U.S.C. § 78u(d)(1). The Sarbanes–Oxley Act of 2002 amended Section 21(d) of the Exchange Act to also allow any federal court to grant "any equitable relief that may be appropriate or necessary." 15 U.S.C. § 78u(d)(5). A district court may exercise its full range of equitable powers, including an asset freeze, to preserve sufficient funds for the payment of a disgorgement award. *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1433–34 (11th Cir.1984); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Co.*, 51 F.3d 982, 987 (11th Cir.1995). Freezing assets is a well accepted equitable remedy employed to "preserve the status quo" and is proper in actions arising under the Securities Act. *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734–35 (11th Cir.2005), citing with approval, *U.S. v. Oncology Assoc., et al.*, 198 F.3d 489, 494–99 (4th Cir.1999); *Levi Strauss*, 51 F.3d at 987 (a request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze).

Lauer argues (in a footnote) that the preliminary injunction authorizing the freeze may well have been improvidently granted because it converted what is essentially a legal monetary claim to fungible funds into an "equitable" remedy. Lauer points to the Supreme Court case, *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), for the proposition that a court does not have the authority in an action at law brought by a private plaintiff to freeze assets to preserve them for potential money damages.

The Supreme Court specifically noted, however, the difference between actions seeking purely money damages and cases such as this one seeking equitable relief. *Id.* at 325, 119 S.Ct. 1961. Also, subsequent to *Grupo*, the Eleventh Circuit specifically ruled that *Grupo* does not bar courts from freezing assets to preserve them for equitable relief, such as disgorgement. *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734–35 (11th Cir.2005) (record supported a disgorgement figure of $21 million and since asset freeze was for less than $21 million, amount of freeze was reasonable); *see also SEC v. Cavanagh*, 445 F.3d 105, 116–119 (2d Cir.2006) (disgorgement is an available remedy under *Grupo's* test for the equity power of federal courts).

Lauer complains that the SEC failed to offer any evidence of a specific disgorgement amount prior to obtaining injunctive relief and that the largest disgorgement amount that could be imposed against him is $11 million. Lauer forgets that he agreed, while represented by counsel, to the blanket asset freeze, not just once, but twice. He has waived any argument that the amount frozen is improper.

### Duration of Asset Freeze

Lauer claims that, in exigent circumstances, a temporary seizure of assets might be justifiable, but far too much time has passed for the asset freeze imposed against him to be deemed "temporary." Lauer relies on *SEC v. Healthsouth Corp.*, 261 F.Supp.2d 1298 (N.D.Ala.2003) for the proposition that courts generally frown on asset freezes of unlimited duration. *Healthsouth* relates, however, to an asset freeze in a civil case which was stayed pending completion of a criminal investigation when the parties had no way to predict when the criminal investigation would

end. *Healthsouth Corp.*, 261 F.Supp.2d at 1325. In this case, the asset freeze is by no means unlimited. The asset freeze will end upon final resolution of this matter on the merits. The main delay in getting to trial has been Lauer's refusal to participate in discovery and his excessive litigiousness. The Court notes that the SEC is ready for trial but Lauer is not and it is Lauer who seeks an additional six months to conduct discovery. *See,* Joint Scheduling Report [DE 1338].

### Due Process Clause of the Fifth Amendment

Lauer now raises a new argument in pursuit of funds (ideally one million dollars) to put him "on at least a somewhat equal footing to the . prosecution arrayed against him" [DE 1306 at 11]. Specifically, Lauer argues his constitutional due process rights under the Fifth Amendment to the United States Constitution are infringed by not, having at a minimum over $777,000 to get through trial. Citing to *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for the proposition that the "fundamental requirement of due process is the right to be heard at a meaningful time and in a meaningful manner," Lauer asserts that without funds to pay fees for experienced counsel and to access documents, to obtain deposition transcripts,[7] to take depositions, to retain expert witnesses, and for related travel and litigation expenses, he is being "precluded from mounting even a minimally adequate defense" and thereby prevented "from having any meaningful opportunity to be heard." [DE 1306 at 8].

█ In his reply, Lauer cites for the first time to three cases for the proposition

that Courts have recognized a due process right to counsel in civil proceedings, and as long as he has untainted funds to pay for a legal defense, he must be allowed access to those funds to retain counsel.[8] All of these cases are inapposite, because, among other reasons, they stand for the principle that a Court should not deny an individual "the right to the aid of counsel when desired and provided by the party asserting the right." *Powell v. State of Ala.*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Here, there is no attempt to prevent Lauer from using counsel. To the contrary, Lauer was offered $10,000 per month with which he could pay for living expenses and counsel. But Lauer turned this down, presumably because he preferred to live in his Greenwich, Connecticut home rather than move to a less expensive dwelling and pay for counsel.

The Supreme Court addressed what the right to counsel actually means in *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (holding that counsel is not required in parental termination hearings). The Court stated:

> In sum, the Court's precedents speak with one voice about what "fundamental fairness" has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

---

7. *See* DE 1385, SEC's Notice of Filing Additional Exhibits, showing that the Receiver has provided Lauer 234,818 pages of documents and the SEC or court reporter provided Lauer with ten of the depositions which have been taken in this matter, free of charge.

8. The three cases are (1) *In re Bellsouth Corporation*, 334 F.3d 941 (11th Cir.2003); (2) *Potashnick v. Port City*, 609 F.2d 1101 (5th Cir.1980); and (3) *Powell v. State of Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

*Id.* at 26–27, 101 S.Ct. 2153; *see also Scott v. Illinois,* 440 U.S. 367, 373, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979) (finding that the reasoning of an earlier case "warrants adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel.") Not only is Lauer not going to be deprived of his physical liberty if he loses this case, but significantly, Lauer is neither indigent nor looking to have counsel appointed.

## Tracing Assets to Fraudulent Activity

After having agreed *twice* to a blanket asset freeze, Lauer now asserts (in a footnote) that because the New York condominium had no relationship to any alleged wrongdoing, the Court has no equitable power over the condominium or the proceeds that resulted from its sale.[9] Lauer cites, among other cases, *S.E.C. v. First City Financial Corp., Ltd.,* 890 F.2d 1215, 1230 (D.C.Cir.1989) (*"First City "*) which states that because "disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing." Several cases have cited *First City* for this proposition, most notably for our purposes, *CFTC v. Sidoti,* 178 F.3d 1132, 1138 (11th Cir.1999), and *SEC v. Gane,* 2005 WL 90154, *19 (S.D.Fla. 2005) (Gonzales, J.).[10] The Eleventh Circuit, relying upon *First City,* held that "the district court may not disgorge profits obtained without the aid of any wrongdoing." *Sidoti,* 178 F.3d at 1138. The *Sidoti* Court went on to find that the district court had abused its discretion for ordering disgorgement of profits for a period

during which there was no record evidence of fraud. *Id.*

Subsequent to *First City,* the Court of Appeals for the District of Columbia reviewed the narrow interpretation Lauer proposes for the holding in *First City* and held to do so conflicts with longstanding precedent and would lead to a monstrous doctrine that would perpetuate rather than correct an inequity. In *SEC v. Banner Fund Int'l, et al.,* the Court of Appeals explained:

> Because disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset, we reject Blackwell's challenge and affirm the district court.
>
> ... As the SEC points out, the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, **the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge.** To hold, as Blackwell maintains, that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. Under Blackwell's approach, for example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement. Blackwell's would be a monstrous doc-

9. Lauer must interpret the footnote as a safe or acceptable place to reassert arguments already made and rejected. *See* DE 31, 44, 52, 61.

10. *SEC v. Gane* is not persuasive authority to the contrary. The ruling in *Gane* was issued

after a trial on the merits and did not deal with an asset freeze. In *Gane,* the Court found that the defendant's unlawful activities did not increase the price of the company's stock that defendants sold so there was no ill-gotten gain to warrant disgorgement.

trine for it would perpetuate rather than correct an inequity.

*SEC v. Banner Fund Int'l, et al.*, 211 F.3d 602, 617 (D.C.Cir.2000) (emphasis supplied).

Many district courts faced with this argument agree that "[t]here is no requirement that frozen assets be traceable to the fraudulent activity underlying a lawsuit." *SEC v. Dennis Crowley*, Case No. 04–80354–Civ–Middlebrooks, Slip. Op. (S.D.Fla.2004) (order by consent by Magistrate Judge Johnson) [DE 1368, Ex. I]; *see also SEC v. A.B. Financing and Inv., Inc.*, Case No. 02–23487–Civ–Ungaro–Benages, Slip. Op. at 2–3. (S.D.Fla.2003) ("a district court may freeze assets not specifically traced to illegal activity" quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir.1995)) [DE 1368, Ex. J]; *SEC v. Belmonte*, No. 88 6557, 1991 WL 214252 (S.D.Fla.1991) (Roettger, J.) (refusing to release funds from sale of home, even though home had been acquired prior to alleged fraud, because there had been no showing that ill-gotten funds had not been used to subsidize mortgage payments or improve home); *SEC v. Current Financial Svcs.*, 62 F.Supp.2d 66, 68 (D.D.Cir.1999) (refusing to release personal funds not traceable to the fraud because defendant's liability exceeded total funds frozen); *SEC v. Grossman*, 887 F.Supp. 649, 661 (S.D.N.Y.1995) ("it is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity") (*aff'd*, 101 F.3d 109 (2d Cir. 1996)); *SEC v. Roor*, No. 99–3372, 1999 WL 553823 at *2 (S.D.N.Y.1999) (denying motion to release so-called "untainted" funds from mortgage of property that pre-existed alleged fraud); *SEC v. Glauberman*, No. 90–5205, 1992 WL 175270 at *1 (S.D.N.Y.1992) (rejecting defendant's argument that funds subject to disgorgement must be traced "dollar for dollar" to the illegal activity).

▪ Recently, the Eleventh Circuit reviewed the propriety of a three year old blanket asset freeze in *ETS Payphones.* In that case, the Eleventh Circuit compared the potential equitable liability of the defendant to the value of the defendant's assets at the time of the freeze. The Eleventh Circuit found it proper that the District Court had frozen all of the defendant's assets because a full asset freeze was necessary to preserve enough funds for the potential disgorgement *ETS Payphones,* 408 F.3d at 735–36. The amount of assets to be frozen, prior to the finding of liability, is determined not by whether the funds themselves are traceable to the fraudulent activity underlying the lawsuit, but by showing a reasonable approximation[11] of the amount, with interest, the defendant was unjustly enriched. *Id.; Securities and Exchange Commission v. Blatt* 583 F.2d 1325, 1335 (5th Cir.1978). By consenting to the blanket asset freeze, Lauer agreed that this standard was met and he cannot complain about it now.

## Conclusion

As explained above, there are any number of reasons why Lauer's arguments

---

**11.** The burden on the SEC for "showing the amount of assets subject to disgorgement (and therefore available for freeze) is light." *SEC v. ETS Payphones,* 408 F.3d 727, 735 (11th Cir.2005). All that is required is "a reasonable approximation of a defendant's ill gotten gains … Exactitude is not a requirement." *Id.* It is well recognized that it is often impossible to calculate disgorgement with precision and exactitude. *Elkind v. Liggett & Myers,* *Inc.,* 635 F.2d 156, 171 (2d Cir.1980). Any risk of uncertainty about exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty. *SEC v. Inorganic Recycling Corp.,* 2002 WL 1968341 (S.D.N.Y.2002) (stating that the risk of uncertainty falls on defendants since fraudsters rarely keep accurate records of the proceeds of their crimes).

made in support of his motion fail they lack merit, they have been rejected previously, and he agreed to the asset freeze over the New York City condominium twice and therefore waived any argument that it was improper. Lauer has not shown an intervening change in controlling law, newly discovered evidence, or a need to correct a clear error or manifest injustice. Fed.R.Civ.P. 60(b). Accordingly, it is hereby

ORDERED AND ADJUDGED that this Court's Order freezing all of Lauer's assets is to remain in full force and effect pending further proceedings in this case. Thus, Defendant Michael Lauer's Motion to Modify Preliminary Injunction Order to Permit Access to His Frozen Funds For Legal Defense Costs [DE 1306] is DENIED.