951 So.2d 1242 (2007)
Jo Ann R. PONTHIER, Wayne Ponthier, Irene Ponthier and Brenda A. Sage
v.
Vincent M. MANALLA, Manalla, Bridges & Hogan, Inc., Creative Planning Associates, Inc., Paul G. Bruns and National Communications Marketing, Inc.
No. 06-CA-632.
Court of Appeal of Louisiana, Fifth Circuit.
January 30, 2007.
*1244 A. Scott Tillery, Tillery & Tillery, Metairie, Louisiana, for Plaintiffs/Appellees, Jo Ann Ponthier, Wayne Ponthier, Irene Ponthier, and Brenda A. Sage.
William W. Hall, William W. Hall & Associates, Metairie, Louisiana, for Defendants/Appellants, Paul G. Bruns and Creative Planning Associates, Inc.
Panel composed of Judges SUSAN M. CHEHARDY, CLARENCE E. McMANUS, and GREG G. GUIDRY.
SUSAN M. CHEHARDY, Judge.
This is a suit for negligent misrepresentation and violation of the Louisiana Securities Law, in which the trial court found the defendants liable and awarded damages to the plaintiffs. We reverse and render.
PROCEEDINGS BELOW
On July 21, 2001, Jo Ann Ponthier, Wayne Ponthier, Irene L. Ponthier, and Brenda A. Sage filed a petition for damages against Vincent M. Manalla, Manalla, Bridges & Hogan, Inc. (hereafter "MBH"), Paul G. Bruns, Creative Planning Associates, Inc. ("CPA"), and National Communications Marketing, Inc. ("NCMI"). The plaintiffs alleged that in 1999 defendants Manalla and Bruns persuaded them to invest money in a scheme to buy pay telephones from NCMI, but the plaintiffs ultimately lost all the money they invested when ETS Payphones, Inc., the company that was managing the pay telephones for the plaintiffs, went bankrupt and the telephones were seized.
The plaintiffs asserted the defendants either knew or should have known of the true situation regarding the pay phones and the soundness of the investment, but failed to provide full and correct information to the plaintiffs, to monitor the financial status of the companies involved, and to advise petitioners of the truth regarding their investment. The plaintiffs alleged further that the defendants negligently misrepresented the true facts and circumstances of the investment, breached their fiduciary relationship to the plaintiffs, failed to fully and properly investigate the investment, and to relay accurate information to the plaintiffs.
In addition, the plaintiffs alleged that the defendants violated the Louisiana Securities *1245 Law, La.R.S. 51:701, et seq.[1] They alleged that the defendants made false or misleading statements of material facts and/or failed to state material facts necessary in order to make their statements not misleading, when the plaintiffs did not know of the untruth or omission, and the defendants knew or in the exercise of reasonable diligence could have known of the untruth or omission. The plaintiffs sought to recover the money they had invested, as well as damages for inconvenience, damage to their credit, embarrassment and humiliation resulting from defendants' negligent misrepresentation regarding the investment.
Bruns' defense was that the duty to provide correct, honest information of the facts and circumstances of the payphone sales was owed by ETS. Bruns argued that he had no knowledge the information was incorrect; he simply passed on information supplied by ETS that he believed to be correct. He contended he had investigated ETS's business and arrangements thoroughly and, despite that investigation, he and others were misled by ETS. He also argued that the plaintiffs did not establish they sustained any damages, because the bankruptcy court had recognized that the investors have an ownership interest in the entity emerging from the bankruptcy. He asserted that the plaintiffs did not establish the elements needed to prove that Bruns had violated the Louisiana Blue Sky Law (Louisiana Securities Law).
Defendants Manalla and MBH did not file an answer. On November 13, 2001, the plaintiffs obtained a default judgment against Manalla and MBH that awarded the plaintiffs $126,000.00 in special damages and $70,000.00 in general damages, for a total of $196,000.00. The judgment reserved the plaintiffs' rights against Paul Bruns, CPA, and NCMI.[2]
The plaintiffs' claims against Bruns and CPA went to a bench trial on April 19, 2005, before a different judge than the judge who heard the testimony on the default judgment against Manalla and MBH.[3] The judge did not render his decision until April 3, 2006, almost a year after the trial. The court found in favor of the plaintiffs and against the defendants, Paul G. Bruns and Creative Planning Associates, Inc., and rendered judgment in the following amounts:

 Special damages
 Wayne Ponthier and Jo Ann Ponthier $ 64,000.00
 Wayne Ponthier and Succession of
 Irene Ponthier $ 21,000.00
 Succession of Irene Ponthier and
 Brenda A. Sage $ 21,000.00
 General Damages
 Wayne Ponthier $ 15,000.00
 Jo Ann Ponthier $ 15,000.00
 Succession of Irene Ponthier $ 25,000.00
 Brenda A. Sage $ 15,000.00
 TOTAL $176,000.00

*1246 The defendants made a timely request for written reasons for judgment, but the trial court never complied with the request.
Bruns and CPA have taken a suspensive appeal. On appeal they assert the trial court erred in the following respects: (1) in finding that Bruns owed a duty to the plaintiffs; (2) in finding that Bruns knew or should have known that any statements he made were misleading or untrue; (3) in finding Bruns liable under Louisiana's Blue Sky Law; (4) in finding CPA liable; (5) in awarding plaintiffs full repayment of their purchase price without deducting the income they received and continue to receive; and (6) in making any award for mental anguish to plaintiff Brenda Sage.
FACTS
At trial the testimony established that NCMI sold payphones to the public via independent contractor sales representatives such as Vincent Manalla and Paul Bruns. The basic arrangement was as follows: The investor would pay $7,000.00 to NCMI for each pay telephone purchased. The investor then would lease the pay telephone to ETS Payphones, Inc. ("ETS"), which would manage, control and maintain the telephones. ETS would pay the investor $82.00 rental per telephone per month for five years. The plaintiffs' understanding was that the income would be tax-free. After five years, the lease would end and the investor either would make a new deal with ETS, or would arrange with another company for management of the telephones.
The Ponthiers (Wayne Ponthier; his wife, Jo Ann Ponthier; his mother, Irene Ponthier; and his sister, Brenda A. Sage) all were persuaded to participate in the scheme and invested enough money to buy multiple pay telephones. For several months they received checks according to the terms of their agreements. In October 2001, however, a check was returned for non-sufficient funds and the plaintiffs then received a letter from ETS announcing that it was filing for Chapter 11 bankruptcy. The plaintiffs learned subsequently that the company had serious financial problems and that it was claiming in the bankruptcy proceedings that it owned the telephones the plaintiffs thought they had purchased.[4]
*1247 By the time the case was tried, Irene Ponthier had died but her succession had not been opened judicially. The parties stipulated that the unopened succession of Irene Ponthier would be substituted as party plaintiff for Irene Ponthier and that plaintiff's counsel was designated as counsel for the unopened succession for purposes of this litigation.
Wayne Ponthier testified he knew Vincent Manalla because Manalla was an insurance agent who had sold him health insurance. Wayne Ponthier also was acquainted with Paul Bruns through Manalla. Manalla called him up and told him about an investment plan with ETS Payphones. Wayne Ponthier was interested, and Manalla and Bruns came to his home to explain the program to him. That was the first time he met Bruns. Bruns gave Wayne Ponthier his business card, which read, "Creative Planning and Associates, Inc., Insurance and Financial Consulting." When Wayne Ponthier decided to purchase some payphones, his checks were made out to NCMI, and he handed the checks to Bruns and Manalla.
According to Wayne Ponthier, Bruns said he was investing in payphones himself. He told Wayne Ponthier he had gone to the company and checked it out and that it was sound. Bruns said he had met its principal, Charles Edwards, and had a personal relationship with him. He told Wayne Ponthier, who is a Church of God minister, that Edwards was a Christian man; he showed Wayne Ponthier letters from Edwards in which Edwards talked about Christianity and the Lord. Wayne Ponthier said that influenced him to invest in the pay phones, because it made him believe what they said about Edwards was true.
Wayne Ponthier said Bruns' Creative Planning Associates business card was in the promotional folder given to him, in the slot for a business card, and Bruns never mentioned anything to him about a company called Bruns Communications.
Based on the representations by Manalla and Bruns, Wayne Ponthier, his wife, his mother, and his sister all decided to invest in the payphone scheme. Wayne Ponthier and his wife invested a total of $84,000.00; Ponthier's mother invested $42,000.00, partnering with her son and her daughter on two equal investments of $21,000.00 each.
Wayne Ponthier testified he received $82.00 per month for each phone, a total of *1248 $328.00 a month, through October 2000. In October 2000 he received a notice ETS had filed for bankruptcy. He contacted Manalla, who told him he knew no more about it. When Wayne Ponthier asked Manalla about recovering the phones, Manalla told him "they" were freezing all the equipment and were planning to sell the equipment to pay off the debts. Manalla was unable to answer his questions about how property that belonged to him and other purchasers of the phones could be seized.
Wayne Ponthier had no contact with Bruns except on the three visits Bruns made with Manalla before to the plaintiffs' buying the phones. When they were talking to him about the program, he got the idea that Manalla was a salesman and was new with the company, and that Bruns knew more about the plan and was there to help Manalla make the presentations to the Ponthiers. Wayne Ponthier did not consult any other financial people before making the investment, because Bruns' card said he was a financial consultant. He trusted Manalla because he had known him for at least a year. He trusted Bruns because Manalla "gave his stamp of approval with him."
Wayne Ponthier did not consult any other professionals before deciding to make the investment. Nor did he call the offices of the Better Business Bureau, the attorney general, or the district attorney. Wayne Ponthier said he felt that Manalla and Bruns could have investigated the plan more, because he found out later that other pay phone companies sell phones that are bonded.
Asked to elaborate on what Bruns told him about his investigations into ETS, Wayne Ponthier said Bruns told him he had met the people "up at the company." He did not know whether Bruns had spoken with an attorney.
Wayne Ponthier said he had planned to use the income from the investment to pay the mortgage note on his home, but without either the capital or the income, he had had to sell other property he owned to pay the bills. "It just affected us greatly," he said. "That was my life savings, this eighty-four thousand dollars. And it went down the tubes."
Wayne Ponthier admitted that ETS was back doing business and that the investors had been given stock in the company, "but it's pennies on the dollar." However, although he had been told he had stock, he had received no paper stock certificates or other documents stating the amount of stock. Asked whether it were true that he had received a stock dividend since the bankruptcy proceedings, he stated, "I don't know if it was a stock dividend." He reiterated that he understood that Manalla was the agent for Bruns.
Jo Ann Ponthier testified she relied on what Bruns and Manalla told her about the investment. To her, Bruns seemed to be Manalla's boss; Manalla appeared to defer to Bruns, and she said Bruns spoke as much as Manalla. She is co-pastor with her husband of their church and, hence, Bruns' reference to ETS CEO Charles Edwards' being a Christian impressed her and made her feel she could trust him and the investment. She did not recall ever receiving or reviewing a financial statement of the company.
Jo Ann Ponthier received checks from ETS from February 2000 until September 2000. In October 2000, she receive correspondence advising that ETS had filed for reorganization under Chapter 11. Subsequently she received a check from the *1249 trustee of the ETS Creditors' Litigation Trust, representing a distribution of approximately thirty-eight cents per share of stock held in ETS. She said she had not received anything else from the trustee.
She opined that Manalla and Bruns, in order to discover the falsity of ETS's representations about the scheme, should have taken the contracts to an attorney for analysis, to make sure they were selling a reputable product and that the investors would own the phones and could not lose them.
Brenda Sage testified she is Wayne Ponthier's sister, and Irene Ponthier was her mother. Her mother died November 15, 2004. Sage testified she did not invest any of her own money in the ETS payphone deal; rather, she assisted her mother in investing her mother's money. She took her mother to Jo Ann Ponthier's real estate office for the meeting with Manalla and Bruns. She corroborated the versions of the meeting given by Wayne and Jo Ann Ponthier. Sage did not ask any questions at the meeting with Bruns and Manalla. The main thing she remembered Bruns saying was that they would never be stuck with the phones in their garage; they would always be able to sell them, and they could back out of the deal and get their money back if they wanted.
As a result of the meeting, Sage said, her mother invested $42,000.00 in the payphone scheme. The documents showing the purchase of three phones for $21,000.00 listed Irene Ponthier and Brenda Sage as joint tenants. Her mother made a similar purchase, in which Wayne Ponthier was listed with her as joint tenant. Sage said her mother put the contracts in both their names because she wanted to protect them in the event of her death. The income that came on a monthly basis from ETS went into her mother's account.
Sage said all of the money had been lost due to the subsequent collapse of ETS. She had received about $87.00 from the litigation trust, which was payable to her mother and her.
Asked whether she had suffered any other damages beyond losing money, Sage said, "No. My mom did, though. Her health really declined after that. It was everything she had." Prior to her mother's signing the contracts in November 1999, she was "doing pretty good," although she had had a stroke and a couple of transient ischemic attacks, but had gotten better. She had all her mental faculties and was living in Sage's home. After the investment losses, however, "she worried so much . . . she went down."
Sage testified her mother "got real depressed and it got to the point where we had to bring her to the skilled care nursing because of her depression. . . . She was a very independent woman and she always had something to fall back on. She didn't want to lean on us. And you could just see she started hallucinating and the doctor said it was all a form of depression."
Sage said she herself had suffered "a little embarrassment," but did not lose any of her own money, "just inheritance."
Paul Bruns testified that his company, Creative Planning and Associates, Inc., was in existence back in 1999 at the time of his dealings with the plaintiffs. He was an independent insurance broker, selling insurance and annuities. He denied that he was a financial planner or financial consultant, but said he has financial consultants that broker through his agency. He admitted he has marketed CPA as furnishing services of financial consulting. *1250 His area was primarily health insurance and marketing. He sold pay phones, but not through CPA. He does not have a license to sell securities.
Bruns denied Wayne Ponthier's claim that Bruns' CPA business card was attached to the folder with the information about the pay phone investment plan. Bruns said at the end of the meeting, Mr. Ponthier asked him if he had a business card and Bruns told him he didn't have one with the pay phone business, but I do have an insurance card I can give you, with the same phone number." Bruns then gave him his CPA card.
Bruns said, "I was asked to take a ride with Vince Manalla. . . . Vince called me up and asked me to take a ride with him. He said he was going to see a client about the pay phones. I said I'll take a ride with you." Bruns said both of them had gone to Atlanta at the same time to check out ETS. When he was dealing with the Ponthiers about the pay phones, he was acting through Bruns Communications, Inc. He dissolved that company by affidavit on July 23, 2004; it had been inactive for three years before that. He did not have a Bruns Communications card with him when he went to meet the Ponthiers with Vince Manalla because he "wasn't really the one going to sell them. . . . Vince was."
He testified that was the first time he had gone on a presentation with Manalla. He went again when Manalla returned to see Wayne Ponthier's family members about buying more. At that time Manalla was an insurance agent with CPA. When Bruns became involved with ETS in 1999, Manalla was still an agent with CPA. Both Bruns and Manalla had contracts directly with NCMI to sell pay phones.
Bruns admitted he first heard of ETS Pay Phones through his friend Tom Murray; at the time of trial, however, he "totally lost contact with him." He did not know whether Tom Murray had been indicted along with Edwards. It was Murray who first told him of investing in pay phones in 1994. At that time Bruns was not interested. Several years later, however, Bruns' interest was piqued.
Bruns met Charles Edwards twice; first, Bruns flew in January 1999 to Atlanta, by himself. He was impressed by the whole operation. He returned on another occasion, bringing with him a number of people: a C.P.A.; his father-in-law, an engineer; Bernard Slusky, a stock analyst; two doctors; Tony Accardo, another financial planner. After that meeting, Edwards sent him some financial data on the company  a quarterly report on the profitability of the company. Subsequently he received a report from the firm that did their accounting.
Asked whether he had done anything else to investigate whether the pay phone company was profitable, he indicated he had contacted the Better Business Bureau and the Chamber of Commerce personally. He also spoke to about ten references from the company  people who had bought pay phones  and asked them about their satisfaction. He did not have a C.P.A. review the financial report from ETS' accounting firm.
Bruns said he had bought two telephones himself. As of the day of trial, however, all he had was stock in the company. He said that when the SEC froze the bank accounts, ETS immediately filed bankruptcy. He understood they were having cash flow problems. The judgment of the bankruptcy court was that the income from the phones was in fact ETA's property because of the leases.
Bruns denied he ever told the Ponthiers that they would own the phones and could *1251 never lose them. The Ponthiers bought phones just like he did, his mother-in-law did, his father-in-law did, and a lot of his friends. He admitted he did not have an attorney review the documents to determine whether there was a risk that people could lose ownership of the phones in a bankruptcy by ETS.
Bruns testified he made sixteen percent commission on the phones he sold, and he sold about fifty phones. He admitted he made about $56,000.00 in commissions off those phones. That did not offset his personal investment of $14,000.00 in his two phones, his father-in-law's three phones, or his mother-in-law's three phones.
Bruns denied that he had trained Manalla. Asked whether he received an override or referral fee on the phones that Manalla sold, Bruns said he could find no record that he got an override on Manalla's business. He stated his deposition testimony that he got an override from Manalla was mistaken, because he had looked into his records and could find no indication he was paid on Vince Manalla's business. He said that most agents at Bruns Communications were under him and contracted to him; Manalla, however, was contracted directly with NCMI.
Bruns denied that he spoke much at the second meeting, the one attended by Jo Ann Ponthier, Irene Ponthier and Brenda Sage. He said that Wayne Ponthier did most of the talking, because he was so enthusiastic about his investment in the pay phone program; Manalla was there to answer any questions, and Bruns said very little. He told them his mother-in-law owned some and he talked about his trips to Atlanta to see the operations.
Bruns said it never occurred to him that this was a Ponzi scheme.[5] He knew that ETS had gone for six or seven years and had never missed a paycheck, or had a problem or complaint. He did not think they had done anything wrong.
Bruns admitted the information he got about the program came from his friend, Tom Murray, and from the ETS CEO, Charles Edwards, and that the documents were from ETS.
Bruns testified that he is the president of CPA, and he and his wife are the sole stockholders of the company; his wife is an employee, but he is not. He created Bruns Communications in order to go into the pay phone business, which was an alternative investment vehicle that didn't align with the insurance business. Bruns Communications executed a sales representative agreement with NCMI.
Bruns denied that he knew that Wayne Ponthier was a minister, prior to learning it at Wayne Ponthier's deposition. Further, when Bruns met Charles Edwards, Edwards did not promote his Christianity to him or in his presentation, although Edwards "definitely does in all his letters." Bruns also denied that either Manalla or he used Christianity to promote the program to the Ponthiers  Bruns said "you *1252 just don't talk about" religion and politics in a sales situation because you don't know what side someone is going to be on. He felt the Ponthiers probably picked that up from Charles Edwards' letters, in which he "was really touting himself as a Christian."
In addition to twice going to Atlanta to investigate ETS' operations and to meet Charles Edwards, Bruns said he spoke with the Better Business Bureau of Atlanta and the Atlanta Chamber of Commerce. He talked to approximately ten people who owned pay phones. He had someone on his staff contact the Georgia attorney general, the Office of Consumer Affairs, the Federal Trade Commission. One of the people who took the Atlanta trip with Bruns asked a Louisiana congressman whom he knew to run an SEC check, which turned up no problems.
In addition, they contacted the Florida Public Telecommunications Association, because NCMI was a member of it. "Somebody," he was unsure whom, ran a credit history check on ETS. In addition, they obtained a letter from an attorney on behalf of NCMI, which stated that the SEC had investigated ETS in 1996 and had given them a clean bill of health. The letter was given to Bruns by his friend Murray. Bruns stated he also learned that two large financial investing institutions, Reliance Trust and Pensco Pension Services, had approved the company for self-directed IRAs. Bruns said after all the background checking, they could not find one complaint in five or six years on ETS. He said it is unusual to find a company that has not had a single complaint against it in that period of time.
Bruns said Vincent Manalla was an independent agent who brokered health insurance through CPA, but he had nothing to do with Bruns Communications. The documentary evidence of the plaintiffs' purchases of the phones shows that Manalla signed the documents as representative of ETS. Bruns' name does not appear on them.
Vincent Manalla testified he learned of the pay phone program through Bruns and another associate in the insurance industry. He was impressed by Bruns' investigation of the company, and he traveled with Bruns to Atlanta to check out the company. It appeared to him to be a well-run and well-funded company, and everything looked on the up-and-up. He met Edwards and was impressed with him.
He became an agent for the program and contracted directly with NCMI; he was not a sub-agent of Bruns, and Bruns did not train him in the business. NCMI provided him with contract information and training videos. Manalla denied that he ever used religion or Christianity in his sales presentation.
Manalla testified he first mentioned the pay phone program to Wayne Ponthier as an alternative to two other types of investments, annuities and viaticals. He said he was the agent on the sales to the Ponthiers, and he received the commissions. He asked Bruns to come along with him on the presentations to the Ponthiers because those were the first ones he sold, and Bruns had done the due diligence reviews. Manalla felt it would benefit the Ponthiers to have someone to question besides him.
Manalla said he did not invest in the phones himself because he did not have the capital at the time. As for the representations that the investors could always get their phones back, which was made in the company literature, Manalla said, "What happened to this company was that the bankruptcy court intervened and basically *1253 screwed everybody, for the lack of a better term."
LAW AND ANALYSIS
The proper standard of review is whether the trial court committed an error of law or made a factual finding that was manifestly erroneous or clearly wrong. Gibson v. State, 99-1730 (La.4/11/00), 758 So.2d 782, 788, cert. denied, 531 U.S. 1052, 121 S.Ct. 656, 148 L.Ed.2d 559. The reviewing court must review the record in its entirety to make this determination. Stobart v. State, DOTD, 617 So.2d 880, 882 (La.1993).
Although a reviewing court will defer to a trial court's reasonable decision on a question or matter properly within the trial court's discretion, but if the trial court's decision is based on an erroneous interpretation or application of the law, such an incorrect decision is not entitled to deference. Kern Search, Inc. v. Sheffield, 434 So.2d 1067, 1071-1072 (La.1983). On legal issues, the appellate court gives no special weight to the finding of the trial court, but exercises its constitutional duty to review questions of law and renders judgment based on the record. Clements v. Folse ex rel. Succession of Clements, XXXX-XXXX (La.App. 1 Cir. 8/14/02), 830 So.2d 307, 312, writ denied, 2002-2328 (La.11/15/02), 829 So.2d 437.
When a trial court fails to render specific findings of fact, a reviewing court must evaluate the record in a light most favorable to the party who prevailed at trial. Jeffers v. Hansen, 441 So.2d 283, 288 (La.App. 4 Cir.1983).
"[W]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993).
Negligent Misrepresentation
Louisiana allows recovery in tort for purely economic loss caused by negligent misrepresentation where privity of contract is absent. Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007, 1014 (La. 1993). For the cause of action to arise, there must be a legal duty on the part of the defendant to supply correct information, there must be a breach of that duty, and the breach must have caused plaintiff damage. Id., at 1015.
Whether Bruns owed a duty to the plaintiffs is a question of law. Lazard v. Foti, 2002-2888 (La.10/21/03), 859 So.2d 656, 659.
Clearly, there was a duty on the part of ETS to supply correct information of the facts and circumstances of the pay phone program. It is undisputed that Bruns did not know that the information was incorrect. Even if Bruns owed a duty to investigate the information supplied by ETS, he supplied the best information available to him, information which he had made numerous efforts to verify. The plaintiffs have not established that Bruns' investigation is the cause-in-fact of their damages. They offered no evidence of other steps Bruns could or should have taken that would have uncovered the falsity of ETS' representations. They have not shown that Bruns was less than "reasonable" in performing his investigations.
Further, we find that the apparent ruling of the bankruptcy court  that the payphones *1254 leased to ETS should be considered assets of the company, and sold to satisfy its debts, with the owners/lessors of the phones given stock in the post-bankruptcy reorganized company in exchange  is not something a reasonable investigation of a potential investment could be expected to anticipate. For example, it is clear from the remarks of both counsel, as well as the trial judge, that none of them could understand how the bankruptcy court came to such a conclusion.
Accordingly, we conclude the trial court erred in finding the defendants liable for negligent misrepresentation.
LOUISIANA SECURITIES LAW
The applicable portions of the Louisiana Securities Law provide as follows:
A. It shall be unlawful for any person:
* * *
(2) To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.
La.R.S. 51:712.
A. Any person who violates R.S. 51:712(A) shall be liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash . . . with interest thereon from the date of payment down to the date of repayment as computed in R.S. 51:714(C)(1), less the amount of any income received thereon, together with all taxable court costs and reasonable attorney's fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security. Damages are the amount which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment as computed in R.S. 51:714(C)(2).
B. Every person who directly or indirectly controls a person liable under Subsection A of this Section, every general partner, executive officer, or director of such person liable under Subsection A of this Section, every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the person liable under Subsection A of this Section unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist. There is contribution as in the case of contract among several persons so liable.
La.R.S. 51:714.
The provisions of the Louisiana Securities Law are analogous to the provisions of the Federal Securities Act of 1933, and state courts may look to federal law and jurisprudence interpreting the securities law for guidance. Taylor v. First Jersey Securities, Inc., 533 So.2d 1383, *1255 1385 (La.App. 4 Cir.1988), writs denied, 538 So.2d 593 and 538 So.2d 594 (La.1989).
In order to prevail in an action under the Securities Law against a broker or salesperson of securities, the plaintiff must show:
(1) the defendant made a false or misleading statement of a material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; (3) the defendant knew, or in the exercise of reasonable diligence, could have known, of the untruth or omission.
Taylor, 533 So.2d at 1386, citing Junker v. Crory, 650 F.2d 1349, 1359 (5th Cir.1981).
Just as stated above regarding the negligent misrepresentation claim, plaintiffs failed to prove their claims against the defendants under the Securities Law. They offered no evidence that Bruns knew, or "in the exercise of reasonable care" could have known, that any statements he made to them were not true. Conversely, Bruns established that he conducted a detailed investigation and that he believed in the legitimacy and soundness of the business opportunity.
We find the trial court was clearly wrong in granting judgment in favor of the plaintiffs. For the foregoing reasons, the judgment is reversed, and judgment is rendered dismissing plaintiffs' claims against Paul Bruns and Creative Planning Associates, Inc. Costs of this appeal are assessed against the plaintiffs.
REVERSED AND RENDERED.
NOTES
[1] Part X of Chapter 2 of Title 51 of the Louisiana Revised Statutes of 1950 was formerly known as the Securities  Blue Sky Law. It was amended and re-enacted by Acts 1985, No. 722, § 1, as the Louisiana Securities Law, and now consists of La.R.S. 51:701 to 51:724. Although the designation "Blue Sky Law" continues to be used by practitioners, we shall refer to these statutes by their official designation, the Louisiana Securities Law. La.R.S. 51:701.
[2] According to the plaintiffs' appellate brief, "NCMI cannot be located and is presumed to be defunct in the wake of the ETS Payphones scandal."
[3] The case was allotted to Judge Alan Green's division and Judge Green presided over the confirmation of the default judgment against Manalla and MBH. By the time of the trial against Bruns and CPA, however, Judge Green was no longer on the bench and Judge Joseph Tiemann was sitting pro tempore in that division.
[4] We take judicial notice that ETS Payphones, Inc. and its CEO, Charles E. Edwards, were sued in a civil enforcement action by the Securities and Exchange Commission ("SEC") for violations of securities laws. The SEC filed suit against ETS and Edwards for an injunction to freeze the company's assets for fraudulent and unregistered offering of securities in violation of the registration and anti-fraud provisions of the federal securities laws. S.E.C. v. ETS Payphones, Inc., 123 F.Supp.2d 1349 (N.D.Ga.2000). ETS, which by then had filed for bankruptcy protection, consented to the injunction without admitting the allegations. Edwards, however, contested the allegations, challenging the SEC's determination that the sale/leaseback of pay telephones was a security and also the freeze against his assets sought by the SEC. The district court ruled in favor of the SEC, granting a preliminary injunction. The district court concluded that the sale/leaseback arrangement fit the definition of an investment contract, as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." S.E.C. v. ETS Payphones, Inc., 123 F.Supp.2d at 1352. As such, it is covered by the Securities and Exchange Acts and was required to be registered, which defendants had failed to do. Further, the court found the defendants had violated the law by selling the unregistered securities to thousands of people in 38 states for five years, using the mails and other forms of media, including internet websites, which were prima facie violations of the Securities Act. The district court concluded that a preliminary injunction and asset freeze were appropriate.

On appeal, the Eleventh Circuit reversed the trial court's ruling. S.E.C. v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir.2002). The court of appeals found that the sale/leaseback arrangement was not an investment contract or security because the investors did not expect profits to be derived solely through the efforts of others; the fixed lease payments could not be considered participation in earnings, and in any event were not derived solely from the efforts of others, but were contractually guaranteed. 300 F.3d at 1285. Based on its finding that the transactions were not investment contracts, which deprived the SEC of jurisdiction over them, the appellate court held that the district court lacked subject matter jurisdiction to entertain the action. 300 F.3d at 1283.
The Supreme Court granted certiorari and reversed the Eleventh Circuit's decision, holding that an investment scheme promising a fixed rate of return can be an "investment contract" and thus a "security" subject to the federal securities laws. S.E.C. v. Edwards, 540 U.S. 389, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004). The Supreme Court remanded the case for further proceedings. On remand, the Eleventh Circuit upheld the district court's grant of the preliminary injunction and the asset freeze. S.E.C. v. ETS Payphones, Inc., 408 F.3d 727 (11th Cir.2005).
[5] "The term `Ponzi scheme,' used to describe a scheme in which a swindler uses money from later victims to pay earlier victims, is derived from the last name of the swindler in Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924)." Guidry v. Bank of LaPlace, 94-1758 (La.App. 4 Cir. 9/15/95), 661 So.2d 1052, 1059. A Ponzi scheme, also known as a pyramid scheme, occurs where original investors of the companies are paid out of funds received by later investors, causing the original investors to think that the company is making a profit. Dunn v. Mortenson, 36,878 (La.App. 2 Cir. 3/5/03), 839 So.2d 1007, 1008 n. 1.