# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #004

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **28th day of January, 2015**, are as follows:

**PER CURIAM**:

2014-B -1761      IN RE: JOHN D. CONRY (Disciplinary Board)

Judge Scott J. Crichton, assigned as Justice ad hoc, sitting for Victory, J. for oral argument. He now sits as an elected Associate Justice at the time this opinion is rendered.

Upon review of the findings and recommendations of the hearing committees and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of John D. Conry, Louisiana Bar Roll number 29807, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. It is further ordered that respondent shall make restitution to his victims, including his clients, the Louisiana State Bar Association's Client Assistance Fund, and all other third parties. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

CRICHTON, J., additionally concurs and assigns reasons.

01/28/15

SUPREME COURT OF LOUISIANA

NO. 14-B-1761

IN RE: JOHN D. CONRY

ATTORNEY DISCIPLINARY PROCEEDINGS

PER CURIAM[*]

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, John D. Conry, an attorney licensed to practice law in Louisiana but currently on interim suspension for threat of harm to the public. *In re: Conry*, 10-1929 (La. 8/25/10), 42 So. 3d 376.

**UNDERLYING FACTS**

11-DB-035

*The Whitney National Bank Matter*

The following facts are not in dispute, having been stipulated to by the parties:

During the relevant time frame, respondent held his client trust account at Whitney National Bank. On November 22, 2006, Whitney charged a $30 overdraft fee to the account. As of November 30, 2006, respondent's account was overdrawn by $2,608.62. On July 17, 2007, Whitney charged a $32 overdraft fee to the account. As of July 31, 2007, respondent's trust account was overdrawn by $12,915.26. Respondent made a $500 deposit to the account during the month of August, but as of August 31, 2007, the account was still overdrawn by $12,415.26.

---

[*] Judge Scott J. Crichton, assigned as Justice ad hoc, sitting for Victory, J. for oral argument. He now sits as an elected Justice at the time this opinion is rendered.

In addition to overdrawing his trust account, respondent used the account to make a $249 car payment to Capital One Auto on March 30, 2007. He used the account on June 12, 2007 to make a $275 payment to Sprint and used it again on June 26, 2007 to make another $300 payment to Sprint. On July 6, 2007, respondent used his trust account to make a $2,092.24 payment to Lexis-Nexis and a $330 payment to Sprint.

On August 14, 2007, Whitney filed suit against respondent to collect the $12,915.26 overdraft. According to the petition, respondent attempted to cover this overdraft on July 16, 2007 by depositing a $19,500 personal check drawn on the account of Reine S. Pema Sanga/John D. Conry. However, this check was returned due to insufficient funds in the account.

On November 28, 2007, respondent made a $14,364.48 payment to Whitney via a cashier's check. On December 3, 2007, the judge presiding over the Whitney suit signed a motion for satisfaction of docket as the matter had been "compromised and resolved completely."

Respondent stipulated that his conduct violated Rule 1.15 (safekeeping property of clients or third persons) of the Rules of Professional Conduct.

*The Watson Matter*

The following facts are not in dispute, having been stipulated to by the parties:

On November 9, 2007, Waymond Watson filed a disciplinary complaint against respondent. According to the complaint, in May 2006, Mr. Watson paid respondent a $900 fee to represent him in a child support matter. After discovering that the state of Florida had jurisdiction over the matter, Mr. Watson retained counsel licensed to practice law in Florida. Via an email dated August 28, 2007, Mr. Watson requested that respondent refund the $900 fee.

2

Respondent agreed to refund the $900 as well as an additional $100 for the "inconvenience caused." On November 27, 2007, approximately three months after his first request for a refund and after several email exchanges between respondent and Mr. Watson regarding respondent's failure to refund the fee, respondent finally provided the $1,000 refund.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.15(d) (failure to timely remit funds to a client or third person), 1.15(e) (when in the course of representation a lawyer is in possession of property in which two or more persons claim interests, the property shall be kept separate by the lawyer until the dispute is resolved), and 8.4(a) (violation of the Rules of Professional Conduct).

### The First Chase Bank Matter

The following facts are not in dispute, having been stipulated to by the parties:

During the relevant time frame, respondent held his client trust account at Chase Bank. On January 10, 2008, a $20,000 check drawn on the account was presented for payment at a time when the account balance was only $5,038.75. The check was returned unpaid, and Chase charged a $25 fee to the account. However, the check cleared the account several days later without incident.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.15 and 8.4(a).

### The Ardoin Matter

The following facts are not in dispute, having been stipulated to by the parties:

3

In the summer of 2007, Raquel Ardoin hired respondent to represent her in an EEOC matter. The fee agreement was a $2,000 fee to be paid in installments. Ms. Ardoin claimed she forwarded one installment payment of $150.

Respondent acknowledged that, in October 2007, Ms. Ardoin forwarded him a right to sue letter she received from EEOC. Respondent informed Ms. Ardoin he was too busy to attend to her legal matter but agreed to work on her case until she was able to retain new counsel. Respondent then failed to timely file her claim.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 1.4 (failure to communicate with a client), and 8.4(a).

*The Second Chase Bank Matter*

Between January 2010 and May 2010, the ODC received several notices from Chase that respondent's client trust account had been overdrawn. Respondent failed to fully cooperate with the ODC in its investigation of this matter by failing to provide the ODC with all requested documents.

The ODC's auditor reviewed respondent's trust account for the period of July 2009 through March 2010 and discovered the following: several online transfers from respondent's operating account to his trust account, several checks deposited to the trust account which were returned because of improper endorsements, and a schedule of negative daily balances in the operating account along with corresponding transfers from the trust account to the operating account to cover the shortages. Additionally, respondent's trust account bank statement for January 2010 indicated total deposits of $49,217.36, of which $42,249.74 (85% of total deposits) was transferred to respondent's operating account. In February 2010, the total deposits in the trust account were $95,818.73, of which $58,163.00 (60% of total deposits) was transferred to the operating account. In March 2010,

4

the total deposits in the trust account were $28,330.79, of which $26,750.00 (94% of total deposits) was transferred to the operating account. Finally, the auditor's report indicated that, between July 2009 and March 2010, respondent received settlement checks totaling $651,820.60 for thirty-eight clients. Eighteen of the clients received no funds from their settlements, and the auditor determined that respondent converted approximately $188,000 of the funds to his own use.

On May 29, 2010, respondent's trust account was overdrawn by $10,504.87. On June 3, 2010, respondent transferred funds in that amount from his operating account to the trust account; however, after the transfer, the operating account was overdrawn by $10,666.23. On July 16, 2010, Chase closed respondent's trust and operating accounts and refused payment of any checks presented on either account.

After Chase ended its banking relationship with respondent, he opened a new trust account with Omni Bank. Respondent did not report the new trust account to the disciplinary board.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.15, 8.1(c) (failure to cooperate with the ODC in its investigation), and 8.4(a).

<u>11-DB-046</u>

*The Melendez Matter*

The following facts are not in dispute, having been stipulated to by the parties:

In January 2009, Rosa Melendez hired respondent to represent her in a personal injury matter. In September 2010, respondent sent Ms. Melendez a $2,871.29 settlement check, drawn on the account of "I Write It Inc."

When Ms. Melendez complained to the ODC, she indicated that respondent never consulted with her before entering into a settlement agreement. She also

indicated that she never endorsed a check from the insurance company and had no knowledge of the settlement amount. Finally, she complained that she made several attempts to contact respondent, to no avail.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.2 (scope of the representation), 1.4, 1.16 (obligations upon termination of the representation), and 8.4(a).

*The Moses Matter*

The following facts are not in dispute, having been stipulated to by the parties:

In August 2007, Inga Moses hired respondent to represent her in a claim against her homeowner's insurance company to recover proceeds to repair Hurricane Katrina damages. Respondent settled the claim, and Ms. Moses endorsed the settlement check.

Respondent was to submit the settlement funds to another agency (the mortgage company, the Road Home program, and/or the Small Business Administration) for reimbursement of funds Ms. Moses received from these agencies for repairs. Once the funds were reimbursed, Ms. Moses would qualify for additional funds to complete the repairs on her home. However, respondent failed to submit the funds to the proper agency, and Ms. Moses was not able to complete her home repairs.

In an August 31, 2009 email to Ms. Moses, respondent explained that he disbursed her funds to the wrong client and was attempting to recover the overpayment. On March 19, 2010, respondent disbursed a $6,500 check to Ms. Moses and explained that the purpose of the check was to cover the interest with the rest being "lagniappe for the hassle." Respondent failed to disburse any additional funds.

6

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.15, 1.16, and 8.4(a).

*The Wells Matter*

The following facts are not in dispute, having been stipulated to by the parties:

Melvin and Maggie Wells contacted the Hurricane Legal Center for representation regarding a hurricane damage claim against their homeowner's insurance company. The Hurricane Legal Center referred the representation to respondent.

Respondent negotiated a $31,000 settlement on the Wellses' behalf, and they met with respondent on May 24, 2010 to sign the receipt, release, and indemnity agreement. Respondent informed the Wellses the settlement proceeds would be disbursed in approximately two weeks.

Three weeks later, when respondent had not yet disbursed the funds, the Wellses mailed respondent a written inquiry via certified mail. Respondent failed to respond to the Wellses' letter. Consequently, the Wellses hired a new attorney, who attempted to contact respondent regarding the disbursement, to no avail.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.4, 1.15, and 1.16.

11-DB-060

*The Joseph Matter*

The following facts are not in dispute, having been stipulated to by the parties:

In 2007, Ora Joseph hired respondent to represent her in a Hurricane Katrina damage claim against her homeowner's insurance company. In July 2010, Ms.

7

Joseph signed settlement documents, but she never received the funds designated for her home repairs. She made several attempts to contact respondent, to no avail.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.4, 1.15, and 8.4(a).

## The Haydel Matter

The following facts are not in dispute, having been stipulated to by the parties:

Respondent entered into an agreement with Dr. Michael Haydel for the medical treatment of respondent's clients with payment to be rendered upon the settlement of the clients' cases. After learning that several cases had settled, Dr. Haydel provided final narrative reports and bills for services rendered to the clients totaling $16,085.00. Respondent failed to pay the outstanding bills.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.15 and 8.4(a).

## The Butler Matter

The following facts are not in dispute, having been stipulated to by the parties:

In 2007, Dolores Butler hired respondent to represent her in a Hurricane Katrina damage claim against her homeowner's insurance company. Respondent contacted Ms. Butler in November 2009 to inform her that her claim had settled for $19,805.86. Ms. Butler met with respondent in February 2010 to sign the settlement check. Respondent did not immediately disburse the settlement funds.

Ms. Butler's husband went to respondent's office unannounced and was issued a $3,000 check. The check was not honored several times due to insufficient funds in the bank account. As such, respondent provided Ms. Butler

with $3,500 in exchange for the check. Later, respondent issued Ms. Butler a $4,000 check. However, he failed to disburse the balance of the settlement.

Respondent stipulated that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.15 and 1.16.

## 12-DB-003

### *The Froeba Matter*

Tammy Froeba hired respondent to represent her in an insurance claim for damages caused by Hurricane Gustav. On October 26, 2010, respondent and Ms. Froeba executed a settlement statement that indicated her claim settled for $11,000, of which she would receive $7,064.50 after all fees were deducted. Instead of issuing Ms. Froeba a check from his client trust account for the total amount due to her, respondent issued a cashier's check to her in the amount of $3,500 on January 4, 2011. Ms. Froeba tried several times to contact respondent regarding the disbursal of the remaining balance, to no avail. Respondent failed to issue the remainder of the funds due to Ms. Froeba.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.4, 1.15(d), 1.16(d) (obligations upon termination of the representation), 8.4(a), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

### *The Parker Matter*

In December 2006, Barbara Parker hired respondent to represent her in an employment matter. Ms. Parker paid respondent a $5,000 retainer fee and signed a contingency fee agreement.

In October 2010, while Ms. Parker's case was still pending, respondent informed her that he was no longer licensed to practice law and she would need to

9

retain new counsel. Respondent offered to refund a share of the retainer fee after he paid all other debts arising from his interim suspension from the practice of law. He has not yet been able to refund the unearned fee.

In her disciplinary complaint against respondent, Ms. Parker claimed that respondent represented her in court for one matter. However, he failed to meet deadlines set by the court, which caused some of her claims to be dismissed.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 1.15(d), 1.16(d), 8.4(a), and 8.4(c).

*The Brown Matter*

Mary Brown hired respondent to represent her in an insurance claim for damages caused by Hurricane Katrina. Respondent settled the claim, and according to Ms. Brown, two checks were issued in the amounts of $10,000 and $20,000. Ms. Brown stated that she received $5,607.08 from the $10,000 settlement; however, she has not received funds from the $20,000 settlement.

She stated that respondent informed her that the $20,000 check had been sent to her mortgage company for endorsement. Ms. Brown told respondent that there was no mortgage on the property because she owned the property. Respondent provided her with the number of the check that he allegedly forwarded to the mortgage company and instructed her to contact the mortgage company to determine whether the check had been negotiated. Ms. Brown stated that the mortgage company informed her they never received a check on her behalf.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.1 (failure to provide competent representation to a client), 1.15(d), 1.16(d), 8.4(a), and 8.4(c).

10

# PROCEDURAL HISTORY

In April 2011, the ODC filed formal charges against respondent in 11-DB-035. Respondent answered the formal charges, asserting that his inexperience in the practice of law caused him to exercise poor management skills in the operation of his law office and caused his improper use of his client trust account as an operating account. He denied converting client funds or engaging in intentional misconduct and denied harming any of his clients; thus, he denied that he violated the Rules of Professional Conduct as alleged in the formal charges. In May 2011, the ODC filed formal charges against respondent in 11-DB-046. Respondent answered the formal charges, denying any misconduct. In June 2011, the ODC filed formal charges against respondent in 11-DB-060. Respondent answered the formal charges, denying any misconduct. In November 2011, these three matters were consolidated by order of the hearing committee chair.

In January 2012, the ODC filed formal charges against respondent in 12-DB-003. Respondent failed to answer the formal charges. Accordingly, the factual allegations contained therein were deemed admitted and proven by clear and convincing evidence pursuant to Supreme Court Rule XIX, § 11(E)(3).

In December 2012, we interimly transferred respondent to disability inactive status pending a hearing to determine the validity of his claim of inability to assist in his defense due to mental or physical incapacity, pursuant to Supreme Court Rule XIX, § 22(C). *In re: Conry*, 12-2544 (La. 12/12/12), 104 So. 3d 410. Upon receiving the hearing committee's report and recommendation, we found respondent's claim of inability to assist in his defense to be invalid and transferred him back to active status. *In re: Conry*, 12-2544 (La. 4/5/13), 110 So. 3d 573. Respondent filed another petition seeking to be transferred to disability inactive status on August 15, 2013, which we denied the same day.

The three consolidated matters and 12-DB-003 were considered by separate hearing committees. The four sets of formal charges were then consolidated by order of the disciplinary board. The board subsequently filed in this court a single recommendation of discipline encompassing all four sets of formal charges.

## 11-DB-035, 11-DB-046, & 11-DB-060

### *Formal Hearing*

As previously indicated, respondent answered the formal charges in these three consolidated matters. The consolidated matters then proceeded to a formal hearing, which was conducted by the hearing committee in August and September 2013. Respondent participated in the August hearing by telephone; he appeared in person at the September hearing.

The ODC called no witnesses to testify before the committee but did introduce documentary evidence, including a list of six claims against respondent paid by the Louisiana State Bar Association's Client Assistance Fund totaling $77,701.73. Respondent's alleged misconduct against the six clients who received funds from the Client Assistance Fund is addressed in the instant formal charges. The documentary evidence also included the transcript of the sworn statement of Dan Rees, who was the executive counsel for the Disaster Recovery Unit of the Louisiana Division of Administration from July 2006 until August 2013.

Mr. Rees, whose sworn statement testimony was related to the second Chase Bank matter, testified that his office handled the subrogation processes for insurance settlements that occurred for a homeowner who had already received a Road Home grant. His office would have to consent to the settlement and then would receive part of the proceeds of the settlement to reimburse the Road Home grant money the homeowner had received. Very often, the settlement check would include the Louisiana Division of Administration as a payee, along with the

homeowner and the homeowner's attorney. Mr. Rees would endorse the settlement check and return it to the attorney for appropriate disbursement to all parties. During his testimony, Mr. Rees examined copies of eight settlement checks made payable to the Louisiana Division of Administration, respondent, and respondent's client. All of the checks were deposited into respondent's trust account between July 2009 and March 2010, the period of the ODC's audit of the account. The gist of Mr. Rees' testimony was that the Louisiana Division of Administration did not receive its portion of the proceeds, which totaled $43,464.80, from these eight settlement checks.[1]

Respondent called his psychiatrist to testify before the committee about the mental health issues from which he suffers, including Attention Deficit Hyperactivity Disorder ("ADHD"), depression, and anxiety. He also introduced copies of cashier's checks totaling $49,844.91, which funds were disbursed to his former clients out of the attorney's fees he would have earned from settlements that were confected after his interim suspension. The Louisiana Division of Administration was paid $12,159.57 of these funds as a third party in many of his clients' homeowner's insurance claims.

Respondent testified on his own behalf and on cross-examination by the ODC. In his testimony, respondent indicated that he opened his first trust account at Whitney in January 2006 when he began practicing law. He admitted that he effectively used the trust account as a personal account. In the summer of 2007, two of his clients received large settlements. One of the settlements, however, was

---

[1] Mr. Rees also indicated that some of the checks contained a forged endorsement of the Louisiana Division of Administration. However, the ODC did not formally charge respondent with misconduct relating to the allegedly forged endorsements. Due process requires that an attorney be given notice of the misconduct for which the disciplinary authority seeks to sanction him, as well as an opportunity to explain his conduct or defend against the charges of misconduct. *In re Ruffalo*, 390 U.S. 544, (1968); *Louisiana State Bar Ass'n v. Keys*, 567 So. 2d 588 (La. 1990). As these requirements were not met, we will not discuss this portion of Mr. Rees' testimony further.

not yet fully funded. Nevertheless, respondent improperly paid the client his total disbursement from the trust account, which resulted in a $12,000 overdraft. Since then, respondent has had a rolling, snowballing deficit in his trust account. He explained that, when a client's case settled, the client would have to wait for payment until the next client's case settled. Since the clients had to wait for payment, he would pay them extra funds to make up for the inconvenience. He would not, however, properly account for the funds he paid out. In the spring of 2008, he attended Trust Accounting School and, thereafter, stopped using his trust account as a personal account. The deficit, however, did not clear up. By 2010, the deficit was so unmanageable that overdrafts began to occur. As such, he did not object to being placed on interim suspension. He referred many of his cases to his former law partner, Kevin Tucker, and instructed Mr. Tucker to disburse his future attorney's fees to his former clients who were still owed money.[2] Respondent further indicated that he believes he still owes his former clients between $50,000 and $100,000. He needs to prepare or have a CPA prepare a full accounting to determine which clients are owed money and how much.

*Hearing Committee Report*

After considering the testimony and evidence presented at the hearing,[3] the hearing committee accepted the facts and rule violations as stipulated to by respondent. With respect to the second Chase Bank matter, to which respondent did not stipulate, the committee appeared to rely heavily on Mr. Rees' sworn statement testimony, finding that respondent deposited these sums into his trust account and then converted them to his own use or otherwise diverted the funds.

---

[2] Respondent introduced documentary evidence of this arrangement.

[3] Prior to the committee's consideration of these consolidated matters, the ODC dismissed four counts of misconduct alleged in 11-DB-035, one count of misconduct alleged in 11-DB-046, and one count of misconduct alleged in 11-DB-060. Accordingly, this opinion does not address these dismissed counts.

The committee determined that respondent violated Rules 1.15, 8.1(c), and 8.4(a) of the Rules of Professional Conduct with respect to this matter.

The committee noted that respondent engaged in multiple instances of conversion of his clients' property. He also neglected legal cases and failed to communicate with clients. The committee further noted that, while respondent claimed he was using client and third party funds to pay other clients, and not himself, he continued to withhold his attorney's fees from settlements in preference of what was owed to the clients and third parties. By putting his own interests above those of his clients, respondent repeatedly violated the basic duties of loyalty an attorney owes to his or her clients. Relying on the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined that the baseline sanction is disbarment.

Turning to respondent's mitigation evidence, the committee noted that respondent's psychiatrist did not say there was a causal connection between respondent's ADHD and his misconduct. While the committee had little doubt that respondent's ADHD played a part in his misconduct, respondent knew he suffered from ADHD when he began practicing law and should have been even more careful to make sure he had assistance with bookkeeping and in managing his accounts properly. The committee also acknowledged respondent's inexperience in the practice of law (admitted 2005) as an explanation for his initial failure to properly manage his trust account and operating account. However, respondent should have been aware of the Rules of Professional Conduct following the Whitney overdrafts in 2007. Nevertheless, he continued violating Rule 1.15 even after he started over with a new trust account at Chase.

Under these circumstances, the committee recommended that respondent be disbarred.

Neither respondent nor the ODC filed a timely objection to the hearing committee's recommendation.

## 12-DB-003

As previously indicated, respondent failed to answer the formal charges in 12-DB-003, and consequently, the factual allegations contained therein were deemed admitted. No formal hearing was held, but the parties were given an opportunity to file with the hearing committee written arguments and documentary evidence on the issue of sanctions. Respondent filed nothing for the hearing committee's consideration.

### *Hearing Committee Report*

After considering the ODC's deemed admitted submission, the hearing committee determined that the factual allegations set forth in the formal charges were proven by clear and convincing evidence. Based on those facts, the committee determined that respondent violated the Rules of Professional Conduct as follows: in the Froeba matter, he violated Rules 1.4, 1.15(d), and 8.4(a); in the Parker matter, he violated Rules 1.3, 1.15(d), 1.16(d), and 8.4(a); and in the Brown matter, he violated Rules 1.4, 1.15(d), and 8.4(a).

The committee further determined that respondent knowingly and intentionally violated duties owed to his clients, the public, the legal system, and the legal profession. His conduct of failing to adequately communicate with his clients and converting client funds to his own use caused actual harm to his clients. Based on the ABA's *Standards for Imposing Lawyer Sanctions* as well as case law addressing similar misconduct, the committee found the baseline sanction to be disbarment.

Under these circumstances, the committee recommended that respondent be disbarred. The committee further recommended that respondent make restitution as follows: $3,564.50 to Ms. Froeba, with legal interest commencing October 26, 2012; $4,000 to Ms. Parker, with legal interest commencing April 5, 2007; and $15,000 to Ms. Brown, with legal interest commencing July 28, 2009.

Neither respondent nor the ODC filed an objection to the hearing committee's recommendation.

## 11-DB-035, 11-DB-046, 11-DB-060, & 12-DB-003

*Disciplinary Board Recommendation*

Following oral argument before the disciplinary board, respondent and the ODC were given an opportunity to file post-argument briefs. Both filed written briefs for the board's consideration, with respondent arguing that he should be suspended from the practice of law for no more than three years and with the ODC arguing that respondent should be permanently disbarred.

After reviewing the four consolidated matters, the disciplinary board adopted both hearing committees' findings of fact and rule violations. The board determined that respondent engaged in a series of trust account violations in which he repeatedly borrowed funds received on behalf of clients and used those funds to pay other clients still awaiting their settlement funds. He also regularly wrote checks to clients from accounts that had insufficient funds to cover the drafts. When the clients were unable to cash their checks, their calls to respondent's office almost always went unanswered and unreturned. Additionally, the board found that the record reflects several acts of forgery by respondent.

The board further determined that respondent knowingly and intentionally violated duties owed to his clients, the public, the legal system, and the legal profession. His conduct caused actual harm to multiple clients and third parties.

17

After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined that the baseline sanction is disbarment.

In aggravation, the board found the following: a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and indifference to making restitution. In mitigation, the board found the absence of a prior disciplinary record, personal or emotional problems, and inexperience in the practice of law.

Considering respondent's misconduct in light of the permanent disbarment guidelines and the prior jurisprudence of this court, the board recommended that he be permanently disbarred. The board also recommended that respondent be ordered to pay restitution to his clients, the Client Assistance Fund, and third parties.

Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

**DISCUSSION**

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

The record reflects that respondent, among other things, mismanaged his client trust account. This resulted in his failure to remit funds to clients and third parties and in his conversion of client funds. The ODC's auditor determined that, between July 2009 and March 2010 alone, respondent converted approximately $188,000 of client funds to his own use. The record reflects that respondent also failed to pay approximately $59,500 owed to third parties. Respondent's failure to appropriately manage his trust account is a clear violation of the Rules of Professional Conduct.[4]

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

Respondent knowingly and intentionally violated duties owed to his clients, the public, and the legal profession. His conduct caused significant actual harm to his clients and third parties. The applicable baseline sanction in this matter is disbarment.

The aggravating factors present are a dishonest or selfish motive, a pattern of misconduct, and multiple offenses. The mitigating factors present are the absence of a prior disciplinary record, personal or emotional problems, and inexperience in the practice of law.

---

[4] For the reasons discussed in note 1, *supra*, we reject the board's conclusion that respondent's misconduct also encompasses several acts of forgery.

In its report, the disciplinary board concluded that respondent's offenses are so egregious that he should be permanently prohibited from applying for readmission to the bar. We agree.

Respondent converted the funds of multiple clients to his own use or otherwise diverted the funds for purposes for which they were not intended. This intentional misconduct caused actual harm to the clients and to third parties. As such, respondent's conduct amounts to repeated or multiple instances of intentional conversion of client funds with substantial harm, as required by Guideline 1 of the permanent disbarment guidelines set forth in Supreme Court Rule XIX, Appendix E. Respondent has demonstrated a disregard for his clients and for his duties as an attorney. In order to protect the public and maintain the high standards of the legal profession in this state, we find he should not be allowed the opportunity to return to the practice of law in the future.

Accordingly, we will adopt the board's recommendation and permanently disbar respondent. We will also order respondent to make restitution to his victims.

**DECREE**

Upon review of the findings and recommendations of the hearing committees and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of John D. Conry, Louisiana Bar Roll number 29807, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. It is further ordered that respondent shall make restitution to his victims, including his clients, the Louisiana State Bar Association's Client Assistance Fund, and all other third parties. All costs and

20

expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

SUPREME COURT OF LOUISIANA

NO. 14-B-1761

IN RE: JOHN D. CONRY

CRICHTON, J., concurring and assigning additional reasons:

I join in the majority's opinion permanently disbarring respondent, but I write separately to note that I find respondent's pattern of intentional and flagrant misconduct to be particularly outrageous.

Respondent's repeated acts of professional misconduct, as set forth in the *per curiam*, cannot be considered a mistake or omission. The hearing committee found that respondent engaged in multiple instances of conversion (an intentional act), and the disciplinary board determined that respondent knowingly and intentionally violated duties owed to his clients, the public, the legal system, and the profession. Indeed, even after being sued by Whitney National Bank for overdrawing his client trust account (in part as a result of making personal car and phone payments from the account), respondent did not stop committing intentional acts of misconduct. For instance, the month after resolution of the Whitney Bank lawsuit, he again overdrew a client trust account at Chase Bank. He thereafter committed several additional infractions, including repeated failures to promptly disburse settlement funds.

In short, over the years, he continued to disburse settlement funds belonging to one client to other clients – conduct that borders on a Ponzi scheme. *See Ponthier v. Manalla*, 06-632 (La. App. 5 Cir. 1/30/07), 951 So. 2d 1242, 1251 (defining "Ponzi scheme" as "a scheme in which a swindler uses money from later victims to pay earlier victims") (citing *Cunningham v. Brown,* 265 U.S. 1 (1924)). Further, respondent's offhand reference to paying clients "lagniappe for the hassle"

1

of late and missing payments is incongruous – and ridiculous. In my opinion, the vast majority of professional attorneys who follow the Rules of Professional Conduct would view respondent's "lagniappe" as pure theft.

Separately, as explained in the *per curiam*, the hearing committee noted that respondent's psychiatrist did not make a causal connection between respondent's ADHD and his misconduct, but viewed it as playing a part in that misconduct. In my view, though, even if respondent's ADHD was not a "cause" of his misconduct and was merely a contributing factor, it is, at the least, obvious from the outcome that respondent failed adequately to manage his disability. As this Court recognized in another case involving attorney discipline and the claim of ADHD: "ADHD does not deprive an individual of the ability to know the difference between right and wrong." *In re Sharp*, 2009-0207 (La. 6/26/09), 16 So. 3d 343, 346. As such, it "does [not] excuse respondent's behavior" in this matter. *Id.*

Given the repeated and intentional pattern of misconduct here, I support the result of permanent disbarment.